McGEE, Chief Judge.
 

 *501
 
 Gary Scott Goins ("Defendant") was convicted of committing numerous sex offenses
 
 *48
 
 against his students while serving as a teacher and wrestling coach at East Gaston High School ("East Gaston"). Defendant contends the trial court erred by: (1) denying Defendant's motion to dismiss one of his charges for insufficient evidence, (2) admitting evidence that Defendant utilized various "hazing" techniques against his student wrestlers, and (3) not allowing Defendant to introduce evidence of possible bias by one of the complainants. We find no error as to Defendant's first two challenges, and no prejudicial error as to the third.
 

 I. Background
 

 Defendant was a teacher and wrestling coach at East Gaston from August 1993 until June 2013. Defendant's employment with East Gaston ended after he was arrested and indicted for numerous sex offenses against three of his former wrestling students ("the complainants").
 

 A. Allen's Testimony
 

 Allen
 
 [1]
 
 testified at trial that he met Defendant in the mid-1990's at a wrestling tournament, when Allen was in eighth grade. Defendant invited Allen to start training with the East Gaston wrestling team the following school year. The practices were more intense than what Allen had been used to. The other wrestlers were "[b]igger guys, ... a lot more defined, [a] lot more mature." The wrestlers and Defendant also used "vulgar" language during practices, and the wrestlers would sometimes get "choked-out" in the locker room-by other wrestlers or Defendant-through the use of an "illegal" wrestling maneuver. After Defendant choked-out a wrestler, "[h]e would just laugh ... [and] kind of make a joke of it.... [It was] something that [you would see] fairly often in the wrestling room."
 

 During the summer of 1997, Allen traveled with Defendant and the East Gaston wrestling team to a wrestling camp at Appalachian State University. The team stayed at a house near the university, and Allen was directed by Defendant to sleep in the same bed as Defendant. That night, Allen "woke up to [Defendant] grabbing [Allen's] hand, ... putting it on
 
 *502
 
 [Defendant's] penis[,]" and masturbating. Allen was fourteen or fifteen years old at the time and weighed one hundred ten pounds.
 

 Allen joined the East Gaston wrestling team in the fall of 1997, at the beginning of tenth grade. Allen continued to go on many team trips with Defendant, which often involved students sharing a hotel room with Defendant. It became "routine" that Defendant "always [had Allen] sle[ep] in the same bed" as Defendant. Allen woke up to Defendant using Allen's hand to masturbate in the middle of the night "probably over a dozen times" on various trips.
 

 Allen also testified about a trip to a tournament in Florida that he took with Defendant and three other wrestlers. One evening, Defendant and the two upperclassmen on the trip, Earl and Frank, went into a drug store. Allen and another underclassman, George, were directed to stay in the car. After Defendant and the upperclassmen returned to the car, they all went back to the hotel room where they were staying. Allen testified that, once they were inside the hotel room,
 

 [Defendant] lock[ed] the door ... [and he said something] like, "All right here we go," and then he-we started to kind of fight around, rumble around and ... [George] and I[got] stripped down to our underwear. And then we found out what was in the bags. They dumped it all out on the bed; the mascara, the lipstick, eyeliner and the whole nine yards. [Defendant and the upperclassmen] commenced to decorating [us] like cheap hookers. They put lipstick on us, the eyeliner, eyelash[,] and then after they decorated us all up there, they started using the lipstick and the eyeliner to draw on us. They circled our nipples with the lipstick and then they started drawing rude comments all over our bodies.... [For instance, on George, they drew a] large arrow pointed down to his ass and then it said, ["]insert here["].... [W]e tried [to fight them off] but they were larger than us and after a
 
 *49
 
 while we just kind of gave in to just ease the pain and ... made it a game.
 

 Defendant then directed Allen and George to "pose in provocative" positions, such as one of them "bent over on all fours ... [and the other] standing behind him" like they were having anal sex, while Defendant took pictures.
 

 Frank, Earl, and George testified about this incident at trial, and their testimony largely corroborated Allen's testimony. According to Frank and Earl, they also wrote things like "I'm a faggot[,]" "I am gay[,]" "I suck
 
 *503
 
 dick [,]" and "I take it in the ass" on Allen's and George's bodies. Frank testified that Defendant kept the photos he took that evening in the top drawer of his filing cabinet at East Gaston. Frank further testified that initially he did not think the "gag" would end up being so "obscene" and that Defendant told Frank and Earl what to do throughout-including instructing them to force Allen and George into the provocative positions if they would not comply. Frank testified "[i]t was one of those things [that started off] ... feel[ing] like it was [just] a little bit [of] hazing[,] until [he] actually realized what[ ] was going on; what [he] just did to those kids." Frank also testified he was afraid that "the same thing would happen to [him,] or [he] would be beaten[,]" if he did not comply with Defendant's commands because Defendant regularly "frogged, ... punched, ... kneed[,] ... [or put in a] choke-hold" wrestlers who did not "do what he told [them] to do." Frank testified that the incident in Florida led, in part, to his quitting the team, giving up his title of team captain, and moving to another school to wrestle.
 

 Regarding Defendant's general behavior on trips, Allen further testified that Defendant
 

 was a big fan of ripping people's underwear off.... Most of the time [he did it] in our travel van.... He would pull over and jump from the driver's seat to the back, pick somebody out, club them down on the back of the head, force them down, grab their underwear and just rip them off as hard as he could....
 

 [Other times, wrestlers] had to stand on the bed [in a hotel room] and [Defendant] was standing on the bed with us, behind us, and we were on the edge of the bed and he had our underwear and he was, like, okay, now jump. And we'd have to jump off of the bed and we were dangling off the bed with him holding our underwear and him trying to pull them up to rip them off.
 

 Although Defendant "did [this] to everybody[,]" Allen stated that Defendant targeted "mostly the smaller" wrestlers for this kind of treatment.
 

 Allen testified Defendant began coming to Allen's house in the summer of 1998 to conduct "mental training sessions." These sessions always occurred while Allen's parents were at work. Defendant would take Allen into Allen's bedroom, lock the door, light a candle, and tell Allen to lie on his bed. Defendant would then run Allen through various relaxation and visualization exercises. However, during one of these
 
 *504
 
 sessions, after Defendant told Allen to visualize finishing a rigorous work-out in his mind, Defendant directed Allen to stand, get completely naked, and pretend he was taking a shower, which Allen did. Defendant then told Allen to lie down on the bed, and Defendant began talking about a girl Allen had a crush on. Allen testified
 

 [Defendant] talked about how I liked her and how I thought she was pretty and stuff like that. And then he had a wig that he put on, a blonde wig. And he kind of said that ["Y]ou thought [that girl] was pretty and she turns you on.... [Y]ou want to be with her, have sex with her[,"] and stuff like that [,] and he would kind of take the wig and drape it across my body to kind of tickle me all the way down. And then after that, I was still naked at the time, and he performed oral sex on me while he was wearing the wig. And it was tickling me and he just continued the oral sex.
 

 During another mental training session, Defendant told Allen to visualize that he was in "a car that was traveling ... in a race."
 

 [Defendant said] I had to pump [my hand] to cross the finish line, to be first. And somewhere along the way [Defendant] pulled out his penis and put it in my hand to where I had to pump [Defendant's] penis
 
 *50
 
 ... to make the car to go faster[.] ... I had to pump to cross the finish line.... [Defendant then] ejaculated ... in the cup of his hand. He said, ["N]ow, you've finished the race and you are tired and you are thirsty[,"] and he said, ["Y]ou need some water.["] And he ... made me drink ... his semen.
 

 During another mental training session, Defendant instructed Allen to "act [ ] like [Defendant's penis] was an ice cream cone and that it was hot outside and that it was melting[,] and [Allen] need[ed] to try to lick the ice cream before it melted all the way off." Allen testified about a similar instance of sexual contact that occurred during a team trip to Fargo, North Dakota. Allen testified he did not report these instances because he was "scared [,] ... didn't know who would believe [him]," and was worried about what people would say if they found out. Allen also "loved wrestling," was trying to earn a scholarship, and was concerned that reporting Defendant would negatively impact his wrestling career.
 

 B. Brad's Testimony
 

 Brad, Allen's younger brother, testified he wrestled at East Gaston from 2000 to 2004, but he began training with Defendant in 1997. At the
 
 *505
 
 time, Brad was eleven years old, and he weighed around sixty pounds. He also began traveling with the team to tournaments. Brad testified these trips were
 

 no-holds-barred.... [P]hysical abuse became okay whether it was the older wrestlers beating the younger wrestlers up or whether it was [Defendant] getting mad at us, jump[ing] in the back seat and turning ... his college ring around his finger and smacking us [on] the top of the head so it wouldn't leave [a] bruise [that people could see].... [Defendant would place me or the other wrestlers in a] painful lock or maneuver where it's like wrenching [an] arm back to [the] point where I'm crying, or seeing another wrestler in tears.... And [Defendant was] just smiling the whole time.... [It was] just something that you had to deal with....
 

 [Sometimes, Defendant would] come up behind us at any minute and just put his arm around us, [and] get[ ] us in a rear choke-lock[,] which isn't even a wrestling move, that's a [mixed martial arts] fighting move. [One time, a wrestler "lost control of [his] bodily functions" after being subjected to this maneuver.] ...
 

 [O]ne of [Defendant's] favorite things used to be, he [would] make us hold-up our shirts. And we would lay on the bed ... in [a] hotel room. We'd be laying on the bed and he [would] say, "All right, pick your shirt up." We would have to hold our shirt up and he'[d] say, "If you flinch, you're getting another ["] ... hit on the stomach with his bare hand[, and] ... with his full force [.] ... [Meanwhile, Defendant would say things like,] "You better not flinch. Don't be a pussy. Just take it." All the while smiling and laughing about it while I was in tears....
 

 Brad also testified that Defendant gave wrestlers extreme wedgies "if [they] made him mad, or if [they] did something wrong, or even ... just for fun [.]" Brad "saw [Defendant give a wedgie] so bad to another wrestler one time [that] ... when [Defendant] pulled [the wrestler's] underwear up, there was blood on it from where he had ripped [the wrestler's] anus[.]"
 
 [2]
 

 *506
 
 On one trip, Brad needed to use the bathroom while Defendant was driving the team back from a tournament. According to Brad, "I told [Defendant] I had to go to the bathroom ... [and he said,] '[I]f you want to go to the bathroom, you better get naked[.] ...' I said, okay. So I got my clothes off, he stops at [an] old skating rink ... [and] he says, '[If] you got to go, you got to go.' He [made] me get out of the car naked, run out [into] that skating rink parking lot and pee and run back."
 

 On another trip in 1999 or 2000, Defendant "forced [Brad] to get naked in front of him and all the other wrestlers[.]" Defendant then used pink athletic tape to give Brad some "underwear." Brad testified
 

 *51
 
 the tape was on my genitals, on my testicles, around my hips just like a pair of underwear would be. And at that point [Defendant] began to make me do exercises; jumping jacks and squats and push-ups in front of all the other guys while they were watching and he is telling me what to do with his pair of pink underwear on. And I'm in pain because it's pulling at parts of my body that shouldn't be pulled by tape and it's just hurting.
 

 Brad testified about another incident when Defendant pulled down the pants of another smaller wrestler, Henry, in front of the other wrestlers and shaved Henry's genitals using a razor and a packet of mayonnaise. Henry also testified at trial and confirmed that he was shaved by Defendant in front of the other wrestlers.
 

 In 2001, Defendant taped Brad to another younger wrestler, back to back, using heavy duty "mat" tape, and then Defendant and the older wrestlers, at Defendant's instruction, used "water guns to squirt ... [their] face[s] and [their] eyes." Brad testified Defendant would sometimes get Brad or another "smaller wrestler ... in some type of [hold] where they can't move their upper body ... and [Defendant] would pull their arm back ... and pull [out] a single armpit hair ... while they're just wincing in pain.... [Defendant] would do [this] to their nipple hair as well." Brad testified that, "[f]rom as early as [he] can remember[,] ... [Defendant had] a motto[ ] [during team trips:] ... [']What happens on trips, stays on trips; don't be a pussy.[']"
 

 Defendant also had Brad sleep in Defendant's bed on some trips. Beginning on a trip in 1998, when Brad was around twelve years old, Brad would sometimes wake up to Defendant "holding [Brad's hand] in a way to where [Brad's] hand [was] on [Defendant's] penis[.]" Other times, Brad would wake up to Defendant touching Brad's penis. Over the seven to eight years that Brad trained under Defendant, Brad slept
 
 *507
 
 in the same bed as Defendant about thirty times, and this kind of thing occurred "[t]en or fifteen times."
 

 Defendant began talking to Brad in May 1999 about having "mental training sessions[,]" which Defendant said had been very helpful for Brad's older brother, Allen. Brad was still twelve years old and weighed no more than ninety pounds. Defendant came over to Brad's house, and they went in Brad's room. Defendant turned off the lights, locked the door, placed a towel in front of a gap under the door, and lit a candle. Brad was instructed to lie on his bed and Defendant ran Brad through various relaxation and visualization exercises.
 

 [Then Defendant said,] "Okay, you're at a race track and you've got to win, you want to be the best. So let's do what we've got to do to be the best. ["] I'm just laying down on my bed ... [a]nd he said[, "]I want you to reach up and you've got to grab the throttle." So I reach my hand up and grab ... his finger.
 

 Defendant instructed Brad to squeeze his finger harder to go faster and to loosen his grip as he imagined going around turns.
 

 [Then Defendant said,] "[O]kay, no[w] you're back from the tournament and some really pretty girls invited you over to their house and their parents are out of town ... [a]nd they invited you over to their house and their parents aren't in and they've got a hot tub and they want you to get in the hot tub.["]
 

 Defendant instructed Brad to "take [his] clothes off to get into the hot tub." Brad removed all of his clothes except for his underwear, but Defendant told him "to get completely naked" and sit on the floor. Defendant talked "about the girls in the hot tub and how pretty they were and how they are trying to kiss" Brad. Defendant then instructed Brad to put his clothes back on and lie on the bed. Defendant had Brad run through the race car exercise again, but this time when Brad "[r]each[ed] up and grab[bed] the throttle [,]" Defendant's penis was in his hand. Brad testified that an almost identical incident happened two months later in his room, and it happened two more times the following summer.
 

 Brad testified he did not report these incidents because he was "scared ... [and other people] trusted [Defendant] so much" that he worried no one would believe him. He also "wanted to be on [the East Gaston wrestling]
 

 *52
 
 team [ever] since [he] was a kid ... [and the] [l]ast
 
 *508
 
 thing [he] wanted to do was to stop that from happening." The final incident of sexual contact with Defendant occurred in 2001, toward the end of Brad's tenth grade year, when Brad was awakened by Defendant placing Brad's hand on Defendant's penis. Around that same time, Brad noticed that Defendant started regularly sleeping with another wrestler on trips, Carl.
 

 C. Carl's Testimony
 

 Carl wrestled at East Gaston from 2001 to 2005 and started training with Defendant when he was still in eighth grade. Two former assistant coaches for the East Gaston wrestling team testified that Carl had a troubled home life, was "[v]ery shy[,]" and needed "somebody to pay ... attention" to him. One coach testified "it seemed like [Carl] wanted somebody to love, or somebody to love him. And [when] anybody ... would show [Carl] attention[,] he was right there with him, almost like a little puppy dog."
 

 Carl testified he was thirteen and weighed less than one hundred pounds when he started training with Defendant. In June 2001, he travelled with the East Gaston wrestling team to a wrestling camp in Pembroke. Carl had already roomed with one of the assistant coaches the first night of camp, but Defendant arrived on the second day and told the other coach: "I'm going to take [Carl] with me [for the rest of camp]." Carl was excited by this because he "looked-up" to Defendant. That night, Defendant conducted a "mental training session" with Carl and ran Carl through some relaxation and visualization exercises. He told Carl to imagine racing on a luge. Defendant had Carl squeeze Defendant's finger to go faster. Defendant removed his finger and told Carl to grab again. This time, Carl was holding Defendant's erect penis. Defendant again instructed Carl to squeeze harder to go faster.
 

 The mental training sessions continued throughout Carl's ninth grade year. They often involved Carl having "to suck on a lollipop ... [to] get all the flavor out[,]" except the "lollipop" was actually Defendant's penis. Carl testified that Defendant somehow got his penis to smell and taste like strawberry, which Defendant knew was Carl's favorite flavor for candy or ice cream. After several minutes, Defendant would ejaculate and make Carl swallow it.
 

 Carl testified these sessions often occurred in the locker room after wrestling practice, when everyone else had left; Defendant regularly drove Carl home because Defendant had instructed Carl not to tell his parents what time practice ended. The sessions also occurred at Defendant's house and in Defendant's classroom. Carl testified these
 
 *509
 
 sessions occurred so frequently, that it was hard "to differentiate between [each session]. It's almost like me asking you to tell me every time you washed your hands; it used to happen so much." Carl also testified about a particular mental training session where he was "supposed to be" hypnotized, and Defendant stuck a safety pin through part of his thumb.
 

 By the end of Carl's ninth grade year, Defendant would simply "put his hand on [Carl's] chest or put his hand on [Carl's] shoulder and [Carl] just kind of knew" it was time to do it. Defendant also started performing oral sex on Carl. During Carl's eleventh grade year, Defendant started having anal sex with Carl, including during a team trip to Cleveland, Ohio, where Defendant had anal sex with Carl "every single day[.]" Carl testified that it was very painful. During the summer between Carl's eleventh and twelfth grade years, Defendant directed Carl to also start having anal sex with him. This continued into Carl's freshman year of college, when Carl demanded that it stop. However, Defendant and Carl maintained a close relationship after that.
 

 In 2010, Carl was involved with mixed martial arts, and he told his trainer that Defendant had sexually abused him when he was younger. The trainer spoke to a mutual friend at the mixed martial arts gym, and that friend reported it to the police. Carl met with the police shortly thereafter, although he was reluctant to incriminate Defendant. The police continued to contact Carl through the spring of 2013. Carl told Defendant "every time" he met with the
 
 *53
 
 police.
 
 [3]
 

 In April 2013, Defendant asked Carl to kill him because of what he had done to Carl and because Defendant thought he would "go to hell" if he killed himself. Carl and Defendant met on the evening of 11 April 2013 and drove to a secluded park in the woods. As it began to storm, Carl choked Defendant, first using the illegal choke-out maneuver he had learned while on the East Gaston wrestling team, and then with a rope, twisted by a dowel, until Defendant's body was convulsing and face-down in the mud. However, Defendant survived and regained consciousness after Carl had left. According to testimony from Defendant's wife ("Mrs. Goins"), Defendant called her around midnight that night and "said that he thought he had been in an accident." Mrs. Goins called 911 and Defendant was taken to the hospital by ambulance. Mrs. Goins testified Defendant was "really muddy, ... had a knot on his forehead,
 
 *510
 
 what looked like a boot print on the side of his face, and ... a rope burn" around his neck.
 

 D. Additional Hazing Testimony
 

 Other former East Gaston wrestlers testified at trial and confirmed that Defendant hazed, choked-out, and gave extreme wedgies to his students. Some former wrestlers testified about a specific instance, during an overnight team lock-in at East Gaston, when Defendant instructed the upperclassmen to apply Icy-Hot muscle cream directly onto the younger wrestlers' genitals and "butt cheeks" using tongue depressors. They also testified about a team camping trip, during which, at Defendant's instruction, the upperclassmen blindfolded the three younger wrestlers on the trip, led them down a railroad track and into a cave, made the younger wrestlers strip naked, and then left, so the younger wrestlers would have to find their way back to camp alone-although their underwear were returned before they had to make their way back to camp. Defendant was present throughout.
 

 Later that same evening, at Defendant's instruction, the upperclassmen blindfolded the younger wrestlers, pulled them from their tents, led them into the woods, and forced them to their knees. The younger wrestlers were told they would have to "suck [a] dick" and that they would be beaten if they did not comply. The younger wrestlers had to open their mouths and were forced to suck on a hot dog smeared with toothpaste. Although there were conflicting accounts, some former wrestlers, including an upperclassman who participated in the incident, testified that Defendant was the one holding the hot dog and instructing the younger wrestlers to suck on it. One of the younger wrestlers who was forced to suck on a hot dog testified that Defendant later pulled him aside and said they were subjected to this treatment because Defendant "wanted to see how dedicated [they] were to the team[.]"
 
 [4]
 

 E. Defendant's Testimony
 

 Defendant testified at trial that he never had any sexual contact with his students and that the hazing Allen, Brad, Carl, and other former wrestlers described at trial was generally "wrestler initiated[.]" However, Defendant did acknowledge that he would choke-out his students, give them wedgies, hit them with his ring, and engage in general
 
 *511
 
 "horseplay[.]" He also acknowledged buying the cosmetics used in the incident where Allen and George were stripped and decorated, but he denied taking any pictures. Defendant testified he thought "hazing" was useful "to find out [which] wrestlers ... are weak so they can be ... culled [from the team]. Because we want the tougher wrestlers to stay in the program." Defendant further testified that he did have a policy of "what happens on trips stays on trips[,]" but the "only reason" he instituted this rule was because he did not want information about injuries, weight-classes, and other strategic
 
 *54
 
 information to get leaked to other teams before matches.
 

 Defendant denied orchestrating the incidents involving younger wrestlers being forced to suck on a hot dog or Icy-Hot being applied to younger wrestlers' genitals. He denied shaving Henry with mayonnaise in front of the other wrestlers. Defendant also testified that he had stopped being so rough with his wrestlers in the mid-to-late 2000's after he had "submit[ted] to Christ." Defendant denied asking Carl to kill him and testified that he could not remember what happened on that night in April 2013 when he was taken to the hospital with a rope burn on his neck.
 

 The jury found Defendant guilty of two counts of statutory sexual offense, six counts of taking indecent liberties with a minor, four counts of taking indecent liberties with a student, three counts of sexual activity with a student, and two counts of crimes against nature. Defendant was given an active sentence of six terms of 4 to 5 months, three terms of 10 to 12 months, six terms of 12 to 15 months, and two terms of 144 to 182 months, each to be served consecutively. Upon release, Defendant will be required to register as a sex-offender for thirty years and may be subject to satellite-based monitoring for the remainder of his natural life. Defendant appeals.
 

 II. Defendant's Motion to Dismiss 13 CRS 57120
 

 Defendant contends the trial court erred by not granting his motion to dismiss one of his charges for crimes against nature, in which Defendant allegedly made Allen perform oral sex while pretending Defendant's penis was an ice cream cone ("the ice cream cone incident"). Specifically, Defendant claims the State failed to "present substantial evidence [at trial that] this crime occurred in North Carolina."
 

 This Court reviews a trial court's denial of a motion to dismiss
 
 de novo,
 
 wherein this Court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal. Upon the defendant's motion, this
 
 *512
 
 Court's inquiry is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of [the] defendant's being the perpetrator of such offense. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In making this determination, all evidence is considered in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence.
 

 State v. Moore,
 
 --- N.C.App. ----, ----,
 
 770 S.E.2d 131
 
 , 136 (citations and quotation marks omitted), disc. review denied,
 
 368 N.C. 353
 
 ,
 
 776 S.E.2d 854
 
 (2015). Moreover,
 

 a substantial evidence inquiry examines the sufficiency of the evidence presented
 
 but not its weight,
 
 which is a matter for the jury. Thus, if there is substantial evidence-whether direct, circumstantial, or both-to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.
 

 State v. Hunt,
 

 365 N.C. 432
 
 , 436,
 
 722 S.E.2d 484
 
 , 488 (2012).
 

 In support of Defendant's contention that the State failed to produce substantial evidence that the ice cream cone incident occurred in North Carolina, Defendant provides this Court with the following excerpt between Allen and the prosecutor at trial:
 

 Q. And this was in your bedroom under the same situation? Do you know if this was done during one of these trainings in your bedroom? Did this happen in your bedroom during one of these mental training exercises?
 

 A. I'm not one hundred percent if this one was in my bedroom or not.
 

 Q. Where would you have been, if not?
 

 A. This one may have been at-when we were at Fargo, North Dakota, a large tournament out there.
 

 However, not contained in Defendant's brief is the exchange that immediately followed:
 

 *513
 
 Q. If you told the detective when he was first investigating this that it happened during that summer, would that have been accurate?
 

 *55
 
 A. Yes.
 

 Q. So you're saying that you remember it happening but you're having trouble placing where it happened.
 

 (Pause)
 

 Q. Let me back up. Did he-when this happened with the ice cream cone, was it during the summer time?
 

 A. Yes.
 

 Q. Was it with a candle?
 

 A. Yes.
 

 Q. Were you on your-I think you said you had a futon bed?
 

 A. Yes.
 

 Q. So would it have been in your bedroom or would it have been in-would it have been in your bedroom on the futon bed?
 

 A. Yes. Yes.
 

 The State also introduced a video at trial, without any limiting instruction requested by Defendant, of an interview between Allen and the police. During the interview, Allen outlined in great detail how the ice cream cone incident occurred in his bedroom in Gaston County. Accordingly, the State presented sufficient substantial evidence that this offense occurred in North Carolina.
 

 Id.
 

 Defendant's argument is without merit.
 

 III. Admissibility of the Hazing Testimony
 

 Defendant challenges the admission of testimony from several former East Gaston wrestlers that Defendant utilized various "hazing" techniques against his wrestlers ("the hazing testimony"). Specifically, Defendant contends that the hazing testimony was inadmissible under N.C. Gen.Stat. § 8C-1, Rule 404(b) (2013), on the grounds that it "only showed ... Defendant's propensity for aberrant behavior" and lacked "sufficient commonality" with the sexual misconduct charged. Defendant also contends that the hazing testimony was inadmissible under N.C. Gen.Stat. § 8C-1, Rule 403 (2013), on the ground that it was
 
 *514
 
 unduly prejudicial. "We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion."
 
 State v. Beckelheimer,
 

 366 N.C. 127
 
 , 130,
 
 726 S.E.2d 156
 
 , 159 (2012).
 

 As a preliminary matter, we must determine whether Defendant preserved his challenge to the hazing testimony. Defendant filed a pre-trial motion to exclude evidence that Defendant hazed his wrestlers. The trial court denied Defendant's motion to the extent that the hazing testimony was admissible under Rule 404(b). However, the trial court also stated that it was "probably going to have to address [any Rule 403 ] concerns on a case-by-case basis." During trial, Defendant did not make contemporaneous objections to all of the hazing testimony that he contests in his brief, thereby failing to preserve those particular pieces of challenged testimony for appellate review.
 
 See
 

 State v. Gray,
 

 137 N.C.App. 345
 
 , 348,
 
 528 S.E.2d 46
 
 , 48 (2000) (holding that the defendant "failed to preserve [an] issue for [appellate] review" by failing to make a contemporaneous objection when the challenged evidence was presented at trial, but "elect[ing] to employ [the Court's] discretionary powers under N.C.R.App. P. 2 [to] address [the] issue."). Nonetheless, because the properly preserved portions of the challenged testimony are necessarily intertwined with the unpreserved portions, as in
 
 Gray,
 
 we elect to employ this Court's discretionary powers under Rule 2 of the North Carolina Rules of Appellate Procedure to fully address the challenge contained in Defendant's brief.
 
 See id.;
 
 N.C.R.App. P. 2.
 
 [5]
 

 A. The Hazing Testimony Under Rule 404(b)
 

 Defendant first challenges the admissibility of the hazing testimony under
 
 *56
 
 N.C.G.S. § 8C-1, Rule 404(b). Pursuant to this rule, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, [or] plan[.]"
 

 Id.
 

 Rule 404(b) evidence also may be introduced to "explain[ ] the context, motive[,] and set-up of
 
 *515
 
 the crime [s], ... [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."
 
 State v. Agee,
 

 326 N.C. 542
 
 , 548,
 
 391 S.E.2d 171
 
 , 174 (1990) (citation omitted). " Rule 404(b) state[s] a clear general rule of
 
 inclusion
 
 [.]"
 
 Id.
 
 at 550,
 
 391 S.E.2d at 175
 
 (citation omitted). It allows for the admission of evidence, "as long as it is relevant to
 
 any fact or issue
 
 other than the defendant's propensity to commit the crime[s]" charged.
 
 State v. White,
 

 340 N.C. 264
 
 , 284,
 
 457 S.E.2d 841
 
 , 852-53 (1995) (emphasis added).
 

 However, Rule 404(b) is "constrained by the requirements of similarity and temporal proximity."
 
 Beckelheimer,
 

 366 N.C. at 131
 
 ,
 
 726 S.E.2d at 159
 
 (citation and quotation marks omitted).
 
 [6]
 
 The North Carolina Supreme also has warned that
 

 [w]hen evidence of a prior crime [or bad act] is introduced, the natural and inevitable tendency for a judge or jury is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge.
 

 State v. Carpenter,
 

 361 N.C. 382
 
 , 387-90,
 
 646 S.E.2d 105
 
 , 109-11 (2007) (citations and quotation marks omitted) (excluding 404(b) evidence of a past crime that "describe[d] only generic [illegal] behavior"). Accordingly, because of this "dangerous tendency ... to mislead [the jury] and raise a legally spurious presumption of guilt," the Court has required that such evidence "be subjected to strict scrutiny by the courts."
 
 State v. Al-Bayyinah,
 

 356 N.C. 150
 
 , 154,
 
 567 S.E.2d 120
 
 , 122 (2002) (also excluding 404(b) evidence that described only "generic" illegal behavior).
 

 In response to Defendant's contention that the hazing testimony "only showed ... Defendant's propensity for aberrant behavior[,]" the State argues in its brief that the hazing testimony was admissible under Rule 404(b) because it was "highly probative" of Defendant's alleged intent, plan, or scheme to commit the crimes alleged, in that it helped explain "how [D]efendant selected his victims, why these boys submitted to [D]efendant's increasingly sexual demands, and why the [complainants] never told anyone about the abuse." The State also argues
 
 *516
 
 that this testimony explained Defendant's scheme to utilize "grooming behavior" in order to prepare his students for sexual activity.
 
 [7]
 

 Although the State's brief focuses largely on cases from other jurisdictions holding that expert testimony of grooming behavior may be admissible at trial, our appellate courts have long recognized that lay testimony and other evidence can be admissible under Rule 404(b) to show that a defendant engaged in grooming-like behavior. In
 
 State v. Williams,
 

 318 N.C. 624
 
 , 625,
 
 350 S.E.2d 353
 
 , 354 (1986), the defendant was convicted of raping his daughter. At trial, the defendant's wife testified that the defendant had taken her and the daughter "to an x-rated movie and had told [the daughter] to look at scenes depicting graphic sexual acts."
 
 Id.
 
 at 626-27, 631,
 
 350 S.E.2d at 355, 357
 
 . On appeal, the defendant challenged the admissibility of this evidence under Rule 404(b).
 

 Id.
 

 However, our Supreme Court held that this testimony was admissible for the purposes of
 
 *57
 
 Rule 404(b), because "the daughter's presence at the film at defendant's insistence, and his comments to her[,] show his preparation and plan to engage in sexual intercourse with her and assist in that preparation and plan by making her aware of such sexual conduct and arousing her."
 
 Id.
 
 at 632,
 
 350 S.E.2d at 358
 
 .
 

 Similarly, in
 
 State v. Brown,
 

 178 N.C.App. 189
 
 , 193,
 
 631 S.E.2d 49
 
 , 52 (2006), the complainant, a young girl, testified,
 
 inter alia,
 
 that the defendant showed her pornographic photos, leading up to the time he began molesting and raping her. The trial court allowed the State to introduce those photos into evidence at trial.
 

 Id.
 

 On appeal, the defendant raised a 404(b) challenge to the admission of the photos but not to any of the complainant's testimony.
 

 Id.
 

 at 191
 
 ,
 
 631 S.E.2d at 51
 
 . Nonetheless, this Court held that the photos were admissible because they "served to corroborate [the complainant's] testimony of [the] defendant's actions and provided evidence of [the defendant's] plan and preparation to engage in sexual activities with [the complainant]."
 

 Id.
 

 at 193-94
 
 ,
 
 631 S.E.2d at 52-53
 
 .
 

 The present case is distinguishable from
 
 Williams
 
 and
 
 Brown,
 
 to the extent that the hazing techniques utilized by Defendant were-to
 
 *517
 
 varying degrees-not overtly sexual or pornographic. Nonetheless, our Court also has held that, when a defendant is charged with a sex crime, 404(b) evidence presented at trial does not necessarily need to be limited to other instances of sexual misconduct.
 

 In
 
 State v. Strickland,
 

 153 N.C.App. 581
 
 , 584,
 
 570 S.E.2d 898
 
 , 901 (2002), the defendant was charged with raping his ex-wife. The ex-wife testified at trial that she "suffered physical abuse throughout her marriage to [the] defendant," which ended a year before the alleged rape occurred.
 
 Id.
 
 at 590,
 
 570 S.E.2d at 904
 
 . On appeal, the Defendant challenged the admissibility of this testimony under Rule 404(b), on the ground that "the evidence of previous abuse was not a sufficiently similar act" to the crime charged.
 
 Id.
 
 at 589,
 
 570 S.E.2d at 904
 
 . However, this Court held that the ex-wife's testimony was admissible under Rule 404(b), in part, because,
 

 [
 
 w
 
 ]
 
 hether sexual in nature or not,
 
 [the] defendant had a history of attacking [the complainant] and asserting his physical power over her. The evidence of defendant's prior abuse of [the complainant] was relevant to prove his
 
 pattern of physical intimidation
 
 of [the complainant].
 

 Id.
 
 at 590,
 
 570 S.E.2d at 904-05
 
 (emphasis added).
 

 The present case also is distinguishable from
 
 Williams
 
 and
 
 Brown,
 
 in that the challenged hazing techniques testified to at trial were used on people other than the complainants. However, our appellate courts also have allowed the introduction of 404(b) evidence involving prior bad acts committed against people other than the purported victims in order to establish a common scheme or to provide necessary context to explain how the alleged crimes occurred.
 

 In
 
 State v. Paddock,
 

 204 N.C.App. 280
 
 , 281,
 
 696 S.E.2d 529
 
 , 530 (2010), the defendant was charged with felonious child abuse inflicting serious bodily injury and felony murder, arising out of the death of her three-year-old son. Although the defendant was not charged with abusing her six surviving children, the trial court admitted 404(b) testimony from the surviving children that the defendant had engaged in a "pattern of abuse" against the surviving children, in which she "sought to control their behavior with daily routines and a pattern of corporal punishment that became more severe [over time] ... and escalated significantly in the months prior to [the three-year-old's] death."
 
 Id.
 
 at 285-86,
 
 696 S.E.2d at 533
 
 . Although not all of that alleged mistreatment was necessarily life-threatening, on appeal, this Court held that the trial court did not err by admitting the 404(b) testimony from the surviving children
 
 *518
 
 on the grounds that it was used to show the " defendant's intent, plan, scheme, system or design to inflict cruel suffering, as well as malice and lack of accident" with respect to the crimes charged.
 
 Id.
 
 at 286,
 
 696 S.E.2d at 533-34
 
 .
 

 In the present case, the hazing testimony tended to show that Defendant exerted great physical and psychological power over
 
 *58
 
 his students, singled out smaller and younger wrestlers for particularly harsh treatment, and subjected them to degrading and often quasi-sexual situations. "Whether sexual in nature or not,"
 
 Strickland,
 

 153 N.C.App. at 590
 
 ,
 
 570 S.E.2d at 904
 
 , and regardless of whether some wrestlers allegedly were not victimized to the same extent as the complainants,
 
 see
 

 Paddock,
 

 204 N.C.App. at 285-86
 
 ,
 
 696 S.E.2d at 533
 
 , the hazing testimony had probative value beyond the question of whether Defendant had a "propensity for aberrant behavior."
 
 See
 

 White,
 

 340 N.C. at 284
 
 ,
 
 457 S.E.2d at 852-53
 
 .
 

 Moreover, we are unpersuaded by Defendant's remaining argument that the hazing testimony was inadmissible under Rule 404(b) simply because the alleged crimes occurred "when the [complainants were] alone with" Defendant, while most of the alleged hazing occurred in a group setting. Instead, the hazing testimony was introduced to show a specific intent, plan, or scheme by Defendant to create an environment within the East Gaston wrestling program that allowed Defendant to target particular students, groom them for sexual contact, and secure their silence.
 

 Accordingly, the present case also is distinguishable from
 
 Carpenter
 
 and
 
 Al-Bayyinah,
 
 in that the 404(b) testimony did not describe behavior that was "generic" to the crimes charged against Defendant. Even accounting for the admonitions in
 
 Carpenter,
 

 361 N.C. at 387-88
 
 ,
 
 646 S.E.2d at 109-10
 
 , and
 
 Al-Bayyinah,
 

 356 N.C. at 154
 
 ,
 
 567 S.E.2d at 122
 
 , that courts should be cautious in admitting evidence of other crimes or bad acts, the hazing testimony fell within the permissible bounds of Rule 404(b).
 
 See
 

 Williams,
 

 318 N.C. at 632
 
 ,
 
 350 S.E.2d at
 
 358 ;
 
 Paddock,
 

 204 N.C.App. at 285-86
 
 ,
 
 696 S.E.2d at
 
 533-34 ;
 
 Brown,
 

 178 N.C.App. at 193-94
 
 ,
 
 631 S.E.2d at
 
 52-53 ;
 
 Strickland,
 

 153 N.C.App. at 590
 
 ,
 
 570 S.E.2d at 904-05
 
 . Therefore, the trial court did not err by admitting the hazing testimony under Rule 404(b).
 

 B. The Hazing Testimony Under Rule 403
 

 Defendant next challenges the admissibility of the hazing testimony under N.C.G.S. § 8C-1, Rule 403. Pursuant to Rule 403, evidence that is otherwise admissible "may be excluded if its probative value is
 
 *519
 
 substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
 

 Id.
 

 Defendant's challenge to the hazing testimony under Rule 403 primarily rests on the assertion in his brief that the present case is similar to
 
 State v. Simpson,
 

 297 N.C. 399
 
 ,
 
 255 S.E.2d 147
 
 (1979). In
 
 Simpson,
 
 the defendant was tried for murder, burglary, robbery, and larceny.
 
 Id.
 
 at 400,
 
 255 S.E.2d at 148-49
 
 . The defendant confessed to those crimes during a police interrogation.
 
 Id.
 
 at 406-07,
 
 255 S.E.2d at 152
 
 . He also confessed to the police,
 
 inter alia,
 
 of "having committed sodomy with a dog[.]"
 
 Id.
 
 at 407,
 
 255 S.E.2d at 152
 
 . At trial, "[a]fter the State introduced evidence that defendant had confessed to sodomy with a dog[,] it spent a large part of the trial proving that defendant did, indeed, commit sodomy with a dog."
 
 Id.
 
 at 407,
 
 255 S.E.2d at 152-53
 
 . On appeal, our Supreme Court granted the defendant a new trial because the question of whether the defendant committed sodomy with a dog was "totally irrelevant" to the crimes charged and the State's persistent focus on this issue at trial unduly prejudiced the defendant.
 
 Id.
 
 at 407-08,
 
 255 S.E.2d at 153
 
 . Accordingly, in the present case, Defendant argues that the hazing testimony resulted in "mini trials of irrelevant and collateral evidence" that were unrelated to the issue of Defendant's guilt of the crimes charged.
 

 We are unpersuaded. As discussed
 
 supra,
 
 the hazing testimony was highly probative of Defendant's intent, plan, or scheme to carry out the crimes charged against him. Although the State did spend a measurable portion of trial eliciting testimony from witnesses on these hazing techniques, we do not believe this is necessarily conclusive of Defendant's challenge.
 
 [8]
 
 Defendant was
 
 *59
 
 charged with numerous crimes that occurred over the span of almost a decade, a time during which many students came and went from the East Gaston wrestling program. Defendant's use of hazing techniques appears to have continued throughout that
 
 *520
 
 time. It was reasonably necessary for the State to show that Defendant's conduct was ongoing and pervasive in order to explain how each complainant fell prey to Defendant and how these alleged crimes continued unabated for so long.
 
 Accord
 

 State v. Shamsid-Deen,
 

 324 N.C. 437
 
 , 445,
 
 379 S.E.2d 842
 
 , 847 (1989) ("When similar acts have been performed continuously over a period of years, the passage of time serves to prove, rather than disprove, the existence of a plan."). Therefore, the State's elicitation of the hazing testimony at trial was not excessive. We also do not believe it derailed Defendant's trial from the overall focus of establishing whether the crimes for which he was charged actually occurred.
 

 It is conceivable, however, that the State eventually could have run afoul of Rule 403 had it continued to spend more time at trial on the hazing testimony, or had it elicited a similar amount of 404(b) testimony on ancillary, prejudicial matters that had little or no probative value regarding Defendant's guilt.
 
 See
 

 State v. Hembree,
 

 368 N.C. 2
 
 , 14-16,
 
 770 S.E.2d 77
 
 , 86-87 (2015) (granting the defendant a new trial, in part, because the trial court "allow[ed] the admission of an excessive amount" of 404(b) evidence regarding "a victim for whose murder the accused was not currently being tried");
 
 accord
 

 Simpson,
 

 297 N.C. at 407-08
 
 ,
 
 255 S.E.2d at 153
 
 . However, that is not the case here. Accordingly, the trial court did not abuse its discretion under Rule 403 by admitting the hazing testimony that was presented at trial.
 

 IV. Exclusion of Evidence of Bias by Brad
 

 Defendant challenges the trial court's refusal "to allow defense counsel to cross-examine [Brad] about statements he allegedly made to police and his wife that he was addicted to porn[,] ... [had] an extramarital affair[,] and that he could not control his behavior because of what [Defendant] did to him[,]" ("the bias evidence"). Specifically, Defendant contends the trial court erred by prohibiting him from introducing the bias evidence because it would have shown Brad had a reason to fabricate allegations against Defendant-both to mitigate things with his wife and to save his military career, as adultery is a court-martialable offense.
 

 At trial, the State preemptively moved to exclude the bias evidence before calling Brad as a witness for the State. After hearing arguments from both the State and Defendant, the trial court excluded the bias evidence on the grounds that: (1) it was not relevant, per N.C. Gen.Stat. § 8C-1, Rule 401 (2013) ; (2) it was rendered inadmissible under North Carolina's Rape Shield Statute, per N.C. Gen.Stat. § 8C-1, Rule 412 (2013) ("the Rape Shield Statute"); and (3) any probative value this evidence might have had was substantially outweighed by the danger of
 
 *521
 
 unfair prejudice, per N.C.G.S. § 8C-1, Rule 403. Defendant contends the trial court erred in its decision. We agree.
 

 A. The Bias Evidence Under Rules 401 and 412
 

 Defendant first challenges the trial court's decision to exclude the bias evidence because it was irrelevant under N.C.G.S. § 8C-1, Rule 401, and was rendered inadmissible by the Rape Shield Statute, N.C.G.S. § 8C-1, Rule 412. N.C.G.S. § 8C-1, Rule 401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." North Carolina's Rape Shield Statute provides that
 

 [n]otwithstanding any other provision of law, the sexual behavior of the complainant
 
 *60
 
 is irrelevant to any issue in the prosecution unless such behavior:
 

 (1) Was between the complainant and the defendant; or
 

 (2) Is evidence of specific instances of sexual behavior offered for the purpose of showing that the act or acts charged were not committed by the defendant; or
 

 (3) Is evidence of a pattern of sexual behavior so distinctive and so closely resembling the defendant's version of the alleged encounter with the complainant as to tend to prove that such complainant consented to the act or acts charged or behaved in such a manner as to lead the defendant reasonably to believe that the complainant consented; or
 

 (4) Is evidence of sexual behavior offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the act or acts charged.
 

 N.C.G.S. § 8C-1, Rule 412(b).
 
 [9]
 

 *522
 
 The State primarily argues in its brief-and Defendant does not dispute-that the bias evidence does not fit within one of the prongs of Rule 412(b). The State contends that this rendered the bias evidence inadmissible. In response, Defendant directs this Court to
 
 State v. Martin,
 
 --- N.C.App. ----,
 
 774 S.E.2d 330
 
 ,
 
 disc. review denied,
 
 - -- N.C. ----,
 
 775 S.E.2d 844
 
 (2015). in
 
 martin,
 
 the defendant, a high school substitute teacher, was accused of sexually assaulting a female student.
 

 Id.
 

 at ----,
 
 774 S.E.2d at 331
 
 . The student testified that the defendant walked into the boy's locker room, saw that she was hanging out with two football players, told the boys to leave, and then demanded that she perform oral sex on him.
 

 Id.
 

 at ----,
 
 774 S.E.2d at 331-32
 
 . At trial, the defendant sought to introduce testimony from himself and two other witnesses that the student was performing oral sex on the football players when the defendant entered the locker room.
 

 Id.
 

 at ----,
 
 774 S.E.2d at 332
 
 . The defendant contended that this evidence was necessary to show that the student had a reason to fabricate her accusations against the defendant, to cover up her true actions.
 

 Id.
 

 However, after the defendant's counsel made an offer of proof concerning this evidence, "the trial court ruled that the evidence was
 
 per se
 
 irrelevant because the evidence did not fit under any of the four exceptions provided in our Rape Shield Statute[.]"
 

 Id.
 

 On appeal, this Court noted that
 

 [o]ur Supreme Court has expressly held that the four exceptions set forth in the Rape Shield Statute do not provide "the sole gauge for determining whether evidence is admissible in rape cases."
 
 State v. Younger,
 

 306 N.C. 692
 
 , 698,
 
 295 S.E.2d 453
 
 , 456 (1982). As our Supreme Court has explained, the Rape Shield Statute "define[s] those times when [other] sexual behavior of the complainant is relevant to issues raised in a rape trial and [
 
 is
 
 ]
 
 not a revolutionary move to exclude evidence generally considered relevant in trials of other crimes.
 
 "
 
 State v. Fortney,
 

 301 N.C. 31
 
 , 42,
 
 269 S.E.2d 110
 
 , 116 (1980) (emphasis added). That is, "the [Rape Shield Statute] was not intended to act as a barricade against evidence which is used to prove
 
 *523
 
 issues
 
 common to all trials.
 
 "
 
 Younger,
 

 306 N.C. at 697
 
 ,
 
 295 S.E.2d at 456
 
 (emphasis added). More recently, our Court has held that there may be circumstances where evidence which touches on the sexual behavior of the complainant may be admissible even though it does not fall within one of the categories in the
 
 *61
 
 Rape Shield Statute.
 
 See
 

 State v. Edmonds,
 

 212 N.C.App. 575
 
 , 580,
 
 713 S.E.2d 111
 
 , 116 (2011) (noting that "[t]he lack of a specific basis under [the Rape Shield Statute] for admission of evidence does not end our analysis")[.] ...
 

 Where the State's case in
 
 any
 
 criminal trial is based largely on the credibility of a prosecuting witness, evidence tending to show that the witness had a motive to falsely accuse the defendant is certainly relevant. The motive or bias of the prosecuting witness is an issue that is common to criminal prosecutions in general and is not specific to only those crimes involving a type of sexual assault.
 

 [Accordingly,] [t]he trial court erred by concluding that the evidence was inadmissible
 
 per se
 
 because it did not fall within one of the four categories in the Rape Shield Statute.
 

 Id.
 

 at ----,
 
 774 S.E.2d at 335-36
 
 (footnote omitted).
 

 With respect to N.C.G.S. §§ 8C-1, Rules 401 and 412, the present case is indistinguishable from
 
 Martin
 
 in any meaningful way. The State's case for the charges involving Brad was "based largely on the credibility of [Brad as] a prosecuting witness[.]"
 
 Martin,
 
 --- N.C.App. at ----,
 
 774 S.E.2d at 336
 
 . Defendant sought to introduce "evidence tending to show that [Brad] had a motive to falsely accuse" Defendant.
 
 See
 
 id.
 

 Although, unlike in
 
 Martin,
 
 Defendant sought to introduce the bias evidence during cross-examination of a prosecuting witness,
 
 see
 

 id.
 

 at ----,
 
 774 S.E.2d at 334
 
 (distinguishing
 
 Martin
 
 from
 
 State v. Black,
 

 111 N.C.App. 284
 
 ,
 
 432 S.E.2d 710
 
 (1993), in part, because the defendant in
 
 Martin
 
 did not seek to introduce bias evidence during cross-examination of the complainant), the present case is also distinguishable from
 
 Black
 
 because Defendant did not seek to cross-examine a prosecuting witness about his or her general sexual history.
 
 Cf.
 

 Black,
 

 111 N.C.App. at 289-90
 
 ,
 
 432 S.E.2d at 714
 
 . Instead, Defendant had identified specific pieces of evidence that could show Brad had a reason to fabricate his allegations against Defendant.
 
 Accord
 

 Olden v. Kentucky,
 

 488 U.S. 227
 
 , 232-33,
 
 109 S.Ct. 480
 
 , 483-84,
 
 102 L.Ed.2d 513
 
 , 519-21 (1988) (per curiam) (holding that the defendant, on cross-examination, must be allowed to introduce evidence of the
 
 *524
 
 complainant's relationship with her boyfriend, in order to challenge the credibility of her allegations of rape against the defendant).
 

 The bias evidence was "certainly relevant" under N.C.G.S. § 8C-1, Rule 401.
 
 See
 

 id.
 

 at ----,
 
 774 S.E.2d at
 
 335-36 ;
 
 see also
 

 Younger,
 

 306 N.C. at 697
 
 ,
 
 295 S.E.2d at 456
 
 ("In this case, as in most sex offense cases, the prosecuting witness' testimony is crucial to the State's evidence and [his or] her credibility as a witness can easily determine the outcome at trial."). It also was not barred by N.C.G.S. § 8C-1, Rule 412.
 
 See
 

 Martin,
 
 ---N.C.App. at ----,
 
 774 S.E.2d at
 
 335-36 ; see
 
 also
 

 State v. Thompson,
 

 139 N.C.App. 299
 
 , 309,
 
 533 S.E.2d 834
 
 , 841 (2000) ("The [R]ape [S]hield [S]tatute ... does not apply to false accusations[.]"). Therefore, the trial court erred by excluding the bias evidence under N.C.G.S. §§ 8C-1, Rules 401 and 412.
 

 B. The Bias Evidence Under Rule 403
 

 However, as discussed
 
 supra,
 
 N.C.G.S. § 8C-1, Rule 403 provides that otherwise admissible evidence still "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "[A]lthough cross-examination is a matter of right, the scope of cross-examination is subject to appropriate control in the sound discretion of the court."
 
 State v. Coffey,
 

 326 N.C. 268
 
 , 290,
 
 389 S.E.2d 48
 
 , 61 (1990) (citation omitted). Defendant contends the trial court abused its discretion by excluding the bias evidence under Rule 403. We agree.
 

 "[A] trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant[.]"
 
 Olden,
 

 488 U.S. at 232
 
 ,
 
 109 S.Ct. at 483
 
 ,
 
 102 L.Ed.2d at 520
 
 (citation and quotation
 
 *62
 
 marks omitted). However, "[t]he right of confrontation is an absolute right rather than a privilege, and it must be afforded an accused not only in form but in substance."
 
 State v. Watson,
 

 281 N.C. 221
 
 , 230,
 
 188 S.E.2d 289
 
 , 294 (1972). Although
 

 the trial court has broad discretion in determining whether to admit or exclude evidence, and we are sympathetic to the trial court's legitimate worry that [certain] evidence could complicate the case [before it,] ... we have long held that "[c]ross-examination of an opposing witness for the purpose of showing ... bias or interest is a substantial
 
 *525
 
 legal right, which the trial judge can neither abrogate nor abridge to the prejudice of the cross-examining party."
 

 State v. Lewis,
 

 365 N.C. 488
 
 , 496-97,
 
 724 S.E.2d 492
 
 , 498-99 (2012) (quoting
 
 State v. Hart,
 

 239 N.C. 709
 
 , 711,
 
 80 S.E.2d 901
 
 , 903 (1954) ) (holding the trial court abused its discretion by excluding bias evidence that the lead investigating detective had tampered with the jury in the defendant's previous trial).
 

 The rules discussed above are well-established. However, our Courts have rarely had to resolve the ultimate question of whether a trial court abused its discretion under Rule 403 by excluding otherwise admissible evidence pertaining to the sexual conduct of a prosecuting witness.
 
 See, e.g.,
 

 Younger,
 

 306 N.C. at 697-98
 
 ,
 
 295 S.E.2d at 456-57
 
 (holding that evidence of other sexual conduct to establish bias was not rendered inadmissible by the Rape Shield Statute, but not asked to resolve whether the probative value of this evidence was substantially outweighed by its prejudicial effect);
 
 State v. Rorie,
 
 --- N.C.App. ----, ----,
 
 776 S.E.2d 338
 
 , 345 (same),
 
 allowing temporary stay
 

 368 N.C. 358
 
 ,
 
 776 S.E.2d 512
 
 (2015) ;
 
 Martin,
 
 ---N.C.App. at ----,
 
 774 S.E.2d at 336
 
 (same).
 

 In
 
 Edmonds,
 

 212 N.C.App. at 576
 
 ,
 
 713 S.E.2d at 113
 
 , the defendant was accused of raping a fifteen-year-old girl. After the alleged assault, the complainant allegedly gave inconsistent statements about her general sexual history to the police and medical personnel.
 
 Id.
 
 at 579,
 
 713 S.E.2d at 115
 
 . The defendant sought to introduce these inconsistent statements to attack the complainant's credibility.
 

 Id.
 

 The trial court denied admission of this evidence under the Rape Shield Statute.
 

 Id.
 

 This Court held that evidence of the complainant's inconsistent statements regarding her sexual history was not rendered inadmissible by the Rape Shield Statute, but it was properly excluded, in part, because it "bore no direct relationship to the incident in question[.]"
 
 Id.
 
 at 581,
 
 713 S.E.2d at 116
 
 . "In essence, [the] defendant asked the trial court to do what our Supreme Court said it should not in
 
 Younger,
 
 to admit 'some distant sexual encounter which has no relevance to this case other than showing [that] the witness [was] sexually active.' "
 
 Id.
 
 at 581-82,
 
 713 S.E.2d at 117
 
 (quoting
 
 Younger,
 

 306 N.C. at 696
 
 ,
 
 295 S.E.2d at
 
 456 ).
 
 [10]
 

 The present case is distinguishable from
 
 Edmonds.
 
 Defendant did not seek to discredit Brad generally by introducing evidence of
 
 *526
 
 completely unrelated sexual conduct at trial. Instead, Defendant sought to introduce specific evidence that Brad told "police and his wife that he was addicted to porn ... [and had] an extramarital affair[,] ... [in part] because of what [Defendant] did to him." Defendant wanted to show that those statements revealed Brad had a reason to fabricate his allegations against Defendant-to mitigate things with his wife and protect his military career. Unlike
 
 Edmonds,
 
 the bias evidence that Defendant sought to introduce addressed a direct, "causative link between the proposed impeachment and the incident[s] in question" and emanated from two potentially strong sources of bias.
 
 See
 

 id
 
 at 581,
 
 713 S.E.2d at
 
 116 ;
 
 accord
 

 Younger,
 

 306 N.C. at 698
 
 ,
 
 295 S.E.2d at 456
 
 (noting that prior sexual conduct by a witness may have "low probative value and high prejudicial effect[,]" "absent some factor which ties it to the specific act which is the subject of the trial"). "While a trial court may, of course, impose reasonable limits on defense
 
 *63
 
 counsel's inquiry into the potential bias of a prosecution witness, ... the limitation here was beyond reason."
 
 Olden,
 

 488 U.S. at 232-33
 
 ,
 
 109 S.Ct. at 483
 
 ,
 
 102 L.Ed.2d at 519-21
 
 (per curiam) (citation and quotation marks omitted) (holding that the trial court erred by refusing to allow the defendant to cross-examine the complainant about whether she fabricated rape allegations against the defendant in order to preserve her relationship with her boyfriend). Therefore, the trial court abused its discretion by excluding the bias evidence under N.C.G.S. § 8C-1, Rule 403.
 
 [11]
 

 C. Prejudice
 

 However, this Court must also determine whether the trial court's error unduly prejudiced Defendant, thereby warranting a new trial on the charges involving Brad.
 
 See
 

 Lewis,
 

 365 N.C. at 497
 
 ,
 
 724 S.E.2d at 499
 
 (holding that, after it is determined "the trial court erred by excluding [bias] evidence [,] ... [the Court] must determine whether the [trial]
 

 *527
 
 court's error was prejudicial to [the] defendant"). Regarding the trial court's error in excluding the bias evidence under N.C.G.S. §§ 8C-1, Rules 401, 403, and 412, Defendant would be prejudiced only if "there is a
 
 reasonable
 
 possibility that, had the error[s] in question not been committed, a different result
 
 would have been reached
 
 at the trial[.]" N.C. Gen.Stat. § 15A-1443(a) (2013) (emphasis added) (regarding prejudice for "errors relating to rights arising other than under the Constitution of the United States"). "The burden of showing such prejudice ... is upon the defendant."
 

 Id.
 

 In the present case, "the evidence of [D]efendant's guilt is strong[.]"
 
 See
 

 Lewis,
 

 365 N.C. at 497
 
 ,
 
 724 S.E.2d at 499
 
 . Defendant was on trial for numerous sex offenses that occurred over the span of almost a decade, and all of the complainants testified in great detail about repeated instances of abuse by Defendant. The testimony from Allen, Brad, and Carl regarding this abuse was strikingly similar. Moreover, the unchallenged testimony by the complainants that Defendant engaged in hazing and grooming-like behaviors was largely corroborated by the other former East Gaston wrestlers who testified at trial.
 

 Although the "strength [of the evidence against Defendant] is counterbalanced,"
 

 id.,
 

 by Brad having possible sources of bias and the fact that the present case rested largely on the credibility of the complainants and Defendant, "[g]iven the overwhelming evidence against [D]efendant" that was presented at trial,
 
 State v. Young,
 

 195 N.C.App. 107
 
 , 111,
 
 671 S.E.2d 372
 
 , 375 (2009), Defendant has failed to carry his burden under N.C.G.S. § 15A-1443(a) to show "there is a reasonable possibility that ... a different result would have been reached at the trial" if the trial court had not erred by excluding the bias evidence.
 
 But cf.
 

 Lewis,
 

 365 N.C. at 497
 
 ,
 
 724 S.E.2d at 499
 
 (finding prejudice under N.C.G.S. § 15A-1443(a) where the defendant was being retried for a single instance of breaking and entering, robbery, and sexual assault, the lead detective in the defendant's case had shown bias throughout the investigation-and had even tampered with the jury during the defendant's first trial-and the defendant was prohibited from fully cross-examining the detective on retrial). Therefore, any error by the trial court under N.C.G.S. §§ 8C-1, Rules 401, 403, and 412 did not unduly prejudice Defendant, per N.C.G.S. § 15A-1443(a).
 

 Moreover, Defendant's brief does not provide this Court with an analogous argument that, by prohibiting Defendant from cross-
 
 *64
 
 examining Brad about the bias evidence at trial, the trial court violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution-where, if found, the violation would have
 
 *528
 
 been "prejudicial
 
 unless
 
 " the State established "it was harmless
 
 beyond a reasonable doubt.
 
 " N.C. Gen.Stat. § 15A-1443(b) (2013) (emphasis added) (regarding prejudice for " violation[s] of [a] defendant's rights under the Constitution of the United States"). Defendant has abandoned that argument on appeal.
 
 See
 
 N.C.R.App. P. 28 ;
 
 Viar,
 
 359 N.C. at 402, 610 S.E.2d at 361. Accordingly, we find no prejudicial error by the trial court.
 

 NO ERROR IN PART; NO PREJUDICIAL ERROR IN PART.
 

 Judges ELMORE and DAVIS concur.
 

 [1]
 

 The names of former East Gaston students in this opinion have been changed to protect their identities.
 

 [2]
 

 Several former wrestlers testified they often would cut slits under the elastic of their underwear to minimize the force needed to rip the underwear from their bodies.
 

 [3]
 

 In June 2013, several days after Defendant had been arrested, and after both Allen and Brad told Carl they had given the police statements about what had happened to them, Carl gave the police a full account of what had happened to him.
 

 [4]
 

 Another wrestler very briefly testified about another incident on that camping trip where he was told he was going to be branded on his butt cheek by a coat hanger but, at the last second, an ice cube was applied to his skin. However, he did not testify about the extent, if any, that Defendant was involved.
 

 [5]
 

 However, in the section of Defendant's brief challenging the hazing testimony, Defendant does not cite to the record, or expressly challenge, any of the testimony from the complainants, discussed
 
 supra,
 
 that also could be considered evidence of "hazing" by Defendant. Accordingly, any challenge Defendant may have had as to that specific testimony under N.C. Gen.Stat. §§ 8C-1, Rules 403 and 404(b) has been abandoned.
 
 See
 
 N.C.R.App. P. 28 ("Issues not presented and discussed in a party's brief are deemed abandoned.");
 
 Viar v. N.C. Dep't of Transp.,
 

 359 N.C. 400
 
 , 402,
 
 610 S.E.2d 360
 
 , 361 (2005) ("It is not the role of the appellate courts ... to create an appeal for an appellant.").
 

 [6]
 

 Defendant does not argue in his brief that any of the hazing testimony was inadmissible at trial for lack of temporal proximity to the crimes charged.
 

 [7]
 

 Generally, "[g]rooming refers to deliberate actions taken by a defendant to ... form[ ] ... an emotional connection with the child and ... reduc[e] ... the child's inhibitions in order to prepare the child for sexual activity."
 
 See
 

 United States v. Chambers,
 

 642 F.3d 588
 
 , 593 (7th Cir.2011). Grooming behavior may include "gift-giving, isolating the victim from his guardians, and activity designed to desensitize the victim to sexual advances,
 
 e.g.,
 
 touching in an innocuous manner and thereafter escalating the sexual nature of the touches."
 
 United States v. Hitt,
 

 473 F.3d 146
 
 , 152 (5th Cir.2006).
 

 [8]
 

 Defendant challenges the testimony of certain wrestlers during the State's case-in-chief, whose testimony spans slightly more than two hundred pages of trial transcript. Excluding conversations held outside the presence of the jury, procedural and housekeeping discussions, and testimony on other matters, but including cross-examination of the State's witnesses, the hazing testimony from other wrestlers that is challenged in Defendant's brief makes up about seventy pages of trial transcript. To put this in context, the State's case-in-chief is covered in more than one thousand pages of trial transcript. Defendant's case-in-chief makes up more than nine hundred pages of trial transcript. Yet, Defendant directs this Court to a total of six pages therein in which he claims to have spent time refuting the challenged hazing testimony.
 

 [9]
 

 N.C.G.S. § 8C-1, Rule 412(d) also provides that
 

 [b]efore any questions pertaining to [the sexual history of a witness] are asked[,] ... the proponent of such evidence shall first apply to the court for a determination of the relevance of the [evidence.] ... When application is made, the court shall conduct an in camera hearing, which shall be transcribed, to consider the proponent's offer of proof and the argument of counsel, including any counsel for the complainant, to determine the extent to which such behavior is relevant. In the hearing, the proponent of the evidence shall establish the basis of admissibility of such evidence.
 

 The State contends in its brief that Defendant "failed to make any offer of proof" for the bias evidence at trial, as required by Rule 412(d). However, right before the charge conference at trial, the trial court expressly allowed Defendant to make an offer of proof on this matter.
 

 [10]
 

 The Court in
 
 Edmonds
 
 did not consider the possibility of Constitutional error by the trial court because the defendant did not preserve that issue for appeal.
 
 Id.
 
 at 577-78,
 
 713 S.E.2d at 114
 
 .
 

 [11]
 

 We reiterate what this Court said in
 
 Martin:
 

 In these situations, a trial judge should strive to fashion a compromise. For example, where a defendant claims that the prosecuting witness is falsely accusing him of rape rather than admitting to her boyfriend that her encounter was consensual, the trial court may allow the defendant to introduce evidence of the prosecuting witness' dating relationship with her boyfriend without introducing details of their sexual relationship.
 

 Martin,
 
 --- N.C.App. at ---- n. 6,
 
 774 S.E.2d at
 
 336 n. 6 (citing
 
 Olden,
 

 488 U.S. 227
 
 ,
 
 109 S.Ct. 480
 
 ,
 
 102 L.Ed.2d 513
 
 ). Similarly, in the present case, the trial court could have allowed Defendant to introduce general statements Brad made that he had a "porn addiction" and had engaged in a marital infidelity, while also prohibiting Defendant from introducing irrelevant and needlessly prejudicial details regarding the specifics of those matters.