STATE OF NORTH CAROLINA v. SAMUEL KRIS HUNT

No. 195PA11

(Filed 9 March 2012)

**1. Sexual Offenses— second-degree sexual offense—motion to dismiss—sufficiency of evidence—mentally disabled victim**

The trial court did not err by denying defendant's motions to dismiss the charge of second-degree sexual offense. The record contained sufficient evidence that the victim was mentally disabled, her condition rendered her substantially incapable of resisting defendant's sexual advances, and defendant knew or reasonably should have known of the victim's mental disability.

**2. Sexual Offenses— crimes against nature—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motions to dismiss the charge of crimes against nature. The record contained sufficient evidence that defendant engaged in nonconsensual or coercive sexual acts with a minor.

**3. Sexual Offenses— expert testimony—not necessarily required to establish mental capacity of victim to consent to sexual acts**

The Court of Appeals erred by concluding that expert testimony was required to establish the extent of a victim's mental

capacity to consent to sexual acts including second-degree sexual offense under N.C.G.S. § 14-27.5 or crimes against nature under N.C.G.S. § 14-177. There may be cases involving a person's mental capacity that will necessitate expert testimony, but it was not necessary in this case in light of the victim's own testimony and the significant amount of lay witness testimony regarding the victim's condition.

On discretionary review pursuant to N.C.G.S. § 7A ‛31 of a unanimous decision of the Court of Appeals, —— N.C. App. ——, 710 S.E.2d 339 (2011), reversing a judgment entered on 8 October 2009 by Judge Edwin G. Wilson, Jr. in Superior Court, Randolph County, and vacating defendant's convictions. Heard in the Supreme Court on 10 January 2012.

*Roy Cooper, Attorney General, by Anne M. Middleton, Assistant Attorney General, for the State-appellant.*

*M. Alexander Charns for defendant-appellee.*

JACKSON, Justice.

Defendant was convicted of second-degree sexual offense and crime against nature, based upon the victim's age and inability to consent due to a mental disability. In this appeal we consider whether expert testimony is always necessary to establish whether a victim in such a case had the requisite mental capacity to consent. Because we hold that expert testimony is not required as articulated by the Court of Appeals, and that the State presented sufficient evidence to withstand defendant's motions to dismiss, we reverse and remand.

On 25 May 2008, defendant and his wife hosted a birthday party at a local park for their daughter Madison[1] who was turning sixteen. Approximately thirty people attended the party, including the complaining witness Clara, who was seventeen. Madison and Clara lived on the same street, rode the school bus together, and often visited each other's homes. After the party, defendant and his wife took Madison, Clara, and Madison's friend Ashley back to defendant's house for a sleep over. Defendant and his wife left the house around 9:00 p.m. to patronize several bars in Greensboro. While defendant and his wife were gone, Madison, Clara, Ashley, and defendant's four

---

1. We adopt the pseudonyms used in the Court of Appeals' opinion. In addition, we refer to Madison's other friend who attended the sleep over by the pseudonym "Ashley."

other children—ages four, ten, eleven, and fifteen—watched a movie and looked at pictures from the party while in the living room.

Defendant and his wife returned home around 3:00 a.m. on 26 May 2008. Defendant had consumed six beers and eight to ten "Jäger bombs" at the bars and was admittedly intoxicated. Defendant and his wife went into their bedroom but defendant soon emerged alone, wearing sweatpants but no shirt. Defendant went into the living room, where the children still were watching the movie, and sat down on the couch. Defendant then got up and motioned for Clara to follow him into the kitchen after tapping her on the arm. Clara testified that she followed defendant into the kitchen because she "thought [defendant] was going to show [her] where the cups were" located.

Once they were in the kitchen, defendant began touching Clara outside her clothing on her breasts, vagina, and "butt." Defendant asked Clara, "Do you like it?" Clara testified that she "was scared" and "didn't know what [defendant] was going to do." Defendant then pulled his penis out of his sweatpants. Clara was "shocked" and "thought [defendant] was going to do something else" to her. Instead, defendant forced Clara's head down to his penis and she put her mouth on it. Clara testified that she only put her mouth on defendant's penis because he "forced [her] head down to it." She said that she was "scared" because she "thought [defendant] was going to hurt [her] more than he did." Clara tried to raise her head but defendant pushed it back down to his penis, which he forced into her mouth again. At some point during the encounter, defendant told Clara, "Don't tell nobody. I can get in serious trouble." Eventually, Clara pulled her head away from defendant's penis.

After Clara pulled her head away, defendant told her, "Go in the girls' bedroom and take off your clothes." Instead, Clara returned to the living room and told Ashley that defendant had asked her to go into the girls' bedroom and remove her clothes. Ashley told Madison what Clara had told her. Clara also told Madison that defendant had "touched [her] all over" and "made [her] suck his penis." Madison and Ashley took Clara into the bathroom and stayed with her while she washed her hands and brushed her teeth. Clara asked Madison and Ashley to protect her from defendant. The girls went into Madison's bedroom and talked until they fell asleep at approximately 6:00 a.m. Before they fell asleep, the girls arranged themselves in the bed to protect Clara. Clara was against the wall with Madison lying next to her.

Sometime after the girls fell asleep, defendant came into their bedroom, touched Clara's feet, and motioned for her to come into the hallway. Clara woke Madison, who was sleeping next to her, and told Madison that defendant wanted her to come into the hallway. Madison told Clara not to go into the hallway, and the girls went back to sleep.

Later that morning, Madison woke her mother and told her what had occurred between defendant and Clara. Based on this information, defendant's wife confronted him. Defendant's wife testified that defendant initially denied the accusations, but eventually admitted that Clara had performed oral sex on him. Defendant's wife became upset and told defendant to get out of the house.

At approximately the same time, Clara decided to walk home and tell her father what defendant had done. Defendant started to follow Clara, but then turned around and returned home after Clara called defendant's wife. Defendant subsequently decided to turn himself in to the police. Defendant drove to the Asheboro police station and told an officer on duty that he had "made a mistake" and "messed up." Defendant gave police a statement, admitting that he "rubbed [Clara] on her chest and she put [his] dick in her mouth for about one minute or so." Defendant later admitted to a second officer that he had "sexual relations" with Clara.

On 21 July 2008, defendant was indicted for second-degree sexual offense and crime against nature. On 6 October 2009, defendant was tried in the Superior Court, Randolph County. At the close of the State's evidence and again at the close of all the evidence, defendant moved to dismiss the charges based upon insufficiency of the evidence. In support of these motions, defendant argued in part that the State had not introduced expert testimony to show that Clara had a mental disability that rendered her substantially incapable of consenting to sexual acts or resisting unwanted sexual advances. The trial court denied all defendant's motions.

After deliberating for less than one hour, the jury found defendant guilty of second-degree sexual offense and crime against nature. The trial court then denied defendant's renewed motion to dismiss. The trial court consolidated defendant's convictions and sentenced him to an active term of seventy-three to ninety-seven months imprisonment.

Defendant appealed to the Court of Appeals, which unanimously reversed and vacated defendant's convictions, holding "that in situa-

tions such as presented by this case, where the victim's IQ falls within the range considered to be 'mental retardation[,]' but who is highly functional in her daily activities and communication, the State must present expert testimony as to the extent of the victim's mental disability as defined by N.C.[G.S.] § 14-27.5." *State v. Hunt*, —— N.C. App. ——, ——, 710 S.E.2d 339, 348 (2011) (alteration in original). We allowed the State's petition for discretionary review.

Our standard of review regarding motions to dismiss is well established:

> When reviewing a defendant's motion to dismiss a charge on the basis of insufficiency of the evidence, this Court determines whether the State presented substantial evidence in support of each element of the charged offense. Substantial evidence is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion. In this determination, all evidence is considered in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence. The defendant's evidence, unless favorable to the State, is not to be taken into consideration, except when it is consistent with the State's evidence, the defendant's evidence may be used to explain or clarify that offered by the State. Additionally, a substantial evidence inquiry examines the sufficiency of the evidence presented *but not its weight*, which is a matter for the jury. Thus, if there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.

*State v. Abshire*, 363 N.C. 322, 327-28, 677 S.E.2d 444, 449 (2009) (citations and quotation marks omitted).

The State argues that expert testimony should not be required to establish the extent of a victim's mental capacity to consent to sexual acts and contends that it presented sufficient evidence to withstand defendant's motions to dismiss. During defendant's trial Clara testified for the State, giving the jury the opportunity to observe independently whether or not she was mentally disabled. In addition, the State presented six lay witnesses who testified about Clara's capabilities.

Lisa Cheek was the school social worker for Asheboro High School and had known Clara for almost three and a half years. Cheek

testified that certain children with developmental disabilities can be "mainstreamed" into regular classes but those who likely will struggle in the traditional school environment are placed into the occupational course of study. Cheek stated that Clara had been in occupational training classes for as long as Cheek had known her. Cheek said that Clara was "very up-front about her . . . disabilities." Cheek also testified that Clara had a mental health counselor at N.C. Mentor, a mental health facility for persons with disabilities. Cheek said that Clara's N.C. Mentor counselor met with Clara at least once or twice a week. Cheek further testified that Clara received a Social Security disability check. Cheek stated that the Randolph County Department of Social Services ("DSS") managed Clara's money because Clara was unable to oversee her own finances.

Heather Cox was Clara's special education teacher at Asheboro High School for three years. Cox testified that Clara is intellectually disabled, with an intelligence quotient ("IQ") of sixty-one.[2] Cox explained that Clara struggled intellectually and that her "processing" was slow. Cox further stated that Clara was placed on an individual education plan for students with disabilities. Cox classified Clara's disability as being in the "mild category" and testified that Clara had been placed into the second of three levels of intellectually disabled students in the special education program. Cox explained that students in the second level have more severe disabilities than those in the first level and are not able to learn the general curriculum, even with modifications. These students do not receive a regular high school diploma, but instead receive a certificate upon completion. They generally find work in the restaurant and hospitality industries as housekeepers, fry cooks, dishwashers, and busboys. They are able to function in society with some assistance. Cox testified that Clara had never taken any classes outside the special education curriculum.

Cheryl Lackey handled adult protective referrals for DSS. Lackey testified that Clara had developmental disabilities and an IQ below 70. Lackey stated that DSS prepared a budget for Clara and gave her money for clothes and medication. Lackey also said that Clara lived with Mary Nunez, the mother of another developmentally disabled child, and DSS paid for Clara's room and board. Lackey further testified that Nunez helped Clara go to the store, and representatives from

---

2. According to the American Psychiatric Association, an individual with an IQ between fifty to fifty-five and approximately seventy falls within the "Mild Mental Retardation" category. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th ed. 2000).

N.C. Mentor helped Clara determine what she wanted to do and made sure that she was not neglected or exploited. When asked if Clara could interact with her as an adult, Lackey stated, "Yes, I mean, she can talk to me and everything. But like I said before, she has a problem understanding."

Detective Deborah McKenzie of the Asheboro Police Department testified that she knew Clara based on the five and a half years that she had served as a school resource officer at South Asheboro Middle School. Detective McKenzie had served in law enforcement for twenty years and specialized in the investigation of sexual assaults of women and children. She described Clara as "very child-like" and observed that Clara's "behavior was more child-like for her age group than the other kids at the school." Detective McKenzie interviewed Clara at the police station as part of her investigation of defendant's actions. She testified that "[b]ecause of [Clara's] mental disability, it was more like interviewing a child than a young adult." Detective McKenzie explained that Clara had difficulty writing a statement and that Clara agreed to let Detective McKenzie write it for her instead.

In addition to these witnesses, Madison testified that her family was aware that Clara had disabilities and had talked about it. Defendant's wife also testified that after Clara had visited their house and played with their children a few times, she asked Madison if Clara was "slow." Defendant's wife had observed that Clara seemed to be more at the intellectual level of her ten-year-old daughter than on Madison's level. Defendant's wife also recalled discussing Clara's apparent mental impairment with defendant. In addition, defendant's wife stated that Clara's father had told both defendant and her that Clara was "kind of slow."

After the State presented its witnesses, defendant testified that he "knew [Clara] was sexually active" and "thought that she was used to sexual transactions." Defendant admitted that Clara performed oral sex on him, but stated that it was consensual. Defendant denied that Clara's father or anyone else had told him that Clara was developmentally disabled or "slow." Defendant stated that he had never noticed anything unusual about Clara. Defendant testified that he did not learn that Clara had a mental disability until he was interviewed at the police station.

[1] After carefully reviewing the testimony at trial, we conclude that the trial court properly denied defendant's motions to dismiss the second-degree sexual offense charge. The crime of second-degree sex-

ual offense is set forth in section 14-27.5(a) of the North Carolina General Statutes: "A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person . . . [w]ho is mentally disabled . . . and the person performing the act knows or should reasonably know that the other person is mentally disabled . . . ." N.C.G.S. § 14-27.5(a)(2) (2011). The term "mentally disabled" is defined in section 14-27.1(1) of the North Carolina General Statutes as:

> (i) a victim who suffers from mental retardation, or (ii) a victim who suffers from a mental disorder, either of which temporarily or permanently renders the victim substantially incapable of apprais-ing the nature of his or her conduct, or of resisting the act of vaginal intercourse or a sexual act, or of communicating unwill-ingness to submit to the act of vaginal intercourse or a sexual act.

*Id.* § 14-27.1(1) (2011). Here, the record contains sufficient evidence that: (1) Clara is mentally disabled; (2) her condition rendered her substantially incapable of resisting defendant's sexual advances; and (3) defendant knew or reasonably should have known of Clara's mental disability.

First, the State presented evidence that Clara is mentally disabled. *See id.* §§ 14-27.1(1), -27.5(a)(2). Clara has an IQ of sixty-one. At the time of the incident, Clara was enrolled in special education classes that had a vocational, rather than an academic, focus. According to the testimony of one of her teachers, Clara was placed in the middle level of intellectually disabled students in the special education curriculum. Although Clara earned good grades for her intelligence level, her academic accomplishments were measured differently from those of students who were placed in the regular curriculum.

In addition, the State presented evidence that Clara requires assistance to function in society. Clara receives much of this assis-tance from DSS. Although Clara lives with Nunez, DSS pays for her room and board. DSS also provides Clara with assistance in setting a budget and gives her money to purchase clothes and medication. To ensure that Clara is not taken advantage of when she interacts with others, Clara receives help from both Nunez and representatives from N.C. Mentor. As Lackey testified, Clara "can talk to me and every-thing" but she "has a problem understanding."

Second, the State demonstrated that Clara's condition rendered her substantially incapable of resisting defendant's advances. *See id.*

§ 14-27.1(1). When defendant asked Clara to follow him into the kitchen, she thought he was going to show her where the cups were located. Clara testified that defendant's act of "rubbing" her breasts, vagina, and butt "scared" her because she "didn't know what [defendant] was going to do." Clara said that she was "shocked" when defendant pulled his penis out of his sweatpants. After defendant forced Clara to put his penis into her mouth, Clara again said that she was scared because she "thought [defendant] was going to hurt [her] more than he did." In addition, when Clara tried to raise her head, defendant pushed it back down to his penis.

Finally, the record contains evidence that defendant knew or reasonably should have known about Clara's mental disability. Defendant's wife testified that previously defendant and she had discussed Clara's condition. Defendant's wife further stated that on one occasion defendant, Clara's father, and she discussed Clara's mental disability.

Considered in the light most favorable to the State, *see Abshire*, 363 N.C. at 328, 677 S.E.2d at 449, a reasonable juror could have inferred from this evidence that: (1) Clara was mentally disabled; (2) her condition rendered her substantially incapable of resisting defendant's sexual advances; and (3) defendant knew or should reasonably have known of Clara's mental disability, *see* N.C.G.S. §§ 14-27.1(1), -27.5(a)(2). Therefore, the State presented sufficient evidence to overcome defendant's motions to dismiss the second-degree sexual offense charge. *See Abshire*, 363 N.C. at 327-28, 677 S.E.2d at 449.

[2] In addition, the State presented sufficient evidence to overcome defendant's motions to dismiss the crime against nature charge. *See id.* Section 14-177 of the North Carolina General Statutes states: "If any person shall commit the crime against nature, with mankind or beast, he shall be punished as a Class I felon." N.C.G.S. § 14-177 (2011). "[T]he legislative intent and purpose of [N.C.]G.S. [§] 14-177 . . . is to punish persons who undertake by unnatural and indecent methods to gratify a perverted and depraved sexual instinct which is an offense against public decency and morality." *State v. Stubbs*, 266 N.C. 295, 298, 145 S.E.2d 899, 902 (1966). In response to the United States Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558, 156 L. Ed. 2d 508 (2003), the scope of section 14-177 has been narrowed. *State v. Whiteley*, 172 N.C. App. 772, 777, 616 S.E.2d 576, 580 (2005). Nonetheless, the statute "may properly be used to prosecute conduct in which a minor is involved, conduct involving non-consensual or coercive sexual acts, conduct occurring in a public place, or conduct involving prostitution or solicitation." *Id.* at 779, 616 S.E.2d at 581.

Here the record contains sufficient evidence that defendant engaged in nonconsensual or coercive sexual acts with a minor. As defendant concededly knew, Clara was seventeen at the time of her encounter with him. Defendant also admitted that Clara performed oral sex on him. As we concluded above, the State introduced sufficient evidence to demonstrate that Clara's condition rendered her substantially incapable of resisting defendant's advances. This evidence indicates that the sexual acts were not consensual. In addition, the record suggests that the sexual acts were coercive. Clara testified that defendant "forced" her head down to his penis and "pushed [her] head back down" when she tried to raise it. Clara stated that she only put her mouth on defendant's penis because he "forced [her] head down to it." Clara said that she was "scared" because she "thought [defendant] was going to hurt [her]." Clara also testified that defendant told her twice not to tell anybody because he could get in "serious trouble." Considered in the light most favorable to the State, *see Abshire*, 363 N.C. at 328, 677 S.E.2d at 449, a reasonable juror could infer from these facts that defendant engaged in nonconsensual or coercive sexual acts with a minor, *see Whiteley*, 172 N.C. App. at 779, 616 S.E.2d at 581. Therefore, the State presented sufficient evidence to overcome defendant's motions to dismiss the crime against nature charge. *See Abshire*, 363 N.C. at 327-28, 677 S.E.2d at 449.

**[3]** Accordingly, we hold that the Court of Appeals erred by overruling the trial court. In so holding, we emphasize that expert testimony is not necessarily required to establish the extent of a victim's mental capacity to consent to sexual acts when a defendant is charged with second-degree sexual offense pursuant to section 14-27.5 or crime against nature pursuant to section 14-177 of the North Carolina General Statutes.

Rule 702(a) of the North Carolina Rules of Evidence provides that: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion . . . ." N.C.G.S. § 8C-1, Rule 702(a) (2011) (emphasis added). Thus, Rule 702(a) recognizes the permissive, rather than mandatory, nature of expert testimony. *See* 2 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 184, at 700 (7th ed. 2011) ("The Rule should not be interpreted to require such a witness."). Additionally, it has been well settled in this state that lay witness testimony may be received regarding the mental condition of

an individual whose capacity is at issue. *See Clary's Adm'rs v. Clary*, 24 N.C. (2 Ired.) 78, 83-85 (1841) ("[I]f belief of capacity founded on personal observation be evidence, and we think it is, it is admissible whether the opportunity for observation has been frequent or rare."). Particularly, " '[a]nyone who has observed another, or conversed with him, or had dealings with him, and a reasonable opportunity, based thereon, of forming an opinion, satisfactory to himself, as to the mental condition of such person, is permitted to give his opinion in evidence upon the issue of mental capacity, although the witness be not a psychiatrist or expert in mental disorders.' " *State v. Mayhand*, 298 N.C. 418, 424, 259 S.E.2d 231, 236 (1979) (quoting *In re Will of Brown*, 203 N.C. 347, 350, 166 S.E. 72, 74 (1932)). We previously have applied these principles to authorize lay witness opinions or observations about mental capacity in a variety of contexts. *See, e.g., State v. Silvers*, 323 N.C. 646, 653-54, 374 S.E.2d 858, 863-64 (1989) (capacity to stand trial); *Mayhand*, 298 N.C. at 424-25, 259 S.E.2d at 236 (insanity defense); *In re Will of Jones*, 267 N.C. 48, 51, 147 S.E.2d 607, 609 (1966) (execution of a will and codicil); *Moore v. N.Y. Life Ins. Co.*, 266 N.C. 440, 448-50, 146 S.E.2d 492, 499-500 (1966) (contracts); *State v. Armstrong*, 232 N.C. 727 *passim*, 62 S.E.2d 50 *passim* (1950) (credibility of a witness); *Bryant v. Carrier*, 214 N.C. 191, 193-94, 198 S.E. 619, 620-21 (1938) (liability for punitive damages in criminal conversation case). Moreover, courts in a number of other jurisdictions explicitly have rejected the notion that expert testimony is required to establish that a victim lacks the mental capacity to consent to sexual acts. *See, e.g., Jackson v. State*, 890 P.2d 587, 592 (Alaska Ct. App. 1995) (stating that expert testimony is not required to establish that a victim is "incapable of understanding the consequences of sexual intercourse" because "[a] person's capacity to understand something . . . is a factual issue for the jury . . . [that] may properly be established by circumstantial evidence"); *People v. Thompson*, 142 Cal. App. 4th 1426, 1437, 48 Cal. Rptr. 3d 803, 810 ("There is a nationwide consensus that expert testimony on th[e] issue [of a victim's mental capacity to consent] is not required."), *rev. denied*, 2006 Cal. LEXIS 15393 (2006); *Wilkinson v. People*, 86 Colo. 406, 412, 282 P. 257, 259 (1929) (stating that the jury could determine whether the victim had the mental capacity to consent, without the testimony of expert witnesses, because "[t]he victim was present in court and testified," giving the jury "the opportunity of seeing her, and . . . judging as to her mentality"); *State v. Collins*, 7 Neb. App. 187, 202, 583 N.W.2d 341, 350-51 (1998) (concluding that expert testimony is not always required but when expert testimony is not presented, "a

court must examine the evidence and determine whether the nonexpert testimony is of sufficient probative value to justify a rational finding that the victim was mentally or physically incapable of resisting or appraising the [defendant's] conduct"); *People v. Cratsley*, 86 N.Y.2d 81, 87, 653 N.E.2d 1162, 1165-66 (1995) (stating that "determination of capacity is a judicial, not a medical, function" that "is best based on evidence concerning the victim's ability to function in society" as presented by "[p]eople who observe the [victim] daily" and that this "assessment [is] within the ken of the average juror"); *State v. Kingsley*, 383 N.W.2d 828, 830 (N.D. 1986) (concluding that "expert medical testimony was not required to establish" a prima facie case that the victims were "incapable of understanding the nature of the conduct involved," but such testimony "would have established a stronger case for the prosecution and provided additional helpful information for the juries"); *State v. Summers*, 70 Wash. App. 424, 428-29, 853 P.2d 953, 956 (stating that expert testimony is not "indispensable" to prove a victim's mental incapacity; rather, "[t]he issue is best approached on a case by case basis, by examining whether the non-expert testimony justifies a rational finding that the victim lacked the capacity to consent"), *rev. denied*, 122 Wash. 2d 1026, 866 P.2d 40 (1993); *State v. Perkins*, 2004 WI App. 213, ¶ 21, 277 Wis. 2d 243, 257, 689 N.W.2d 684, 690 ("[W]e cannot conclude that expert testimony should be required in every case to establish the existence of a mental illness or deficiency rendering the victim unable to appraise his or her conduct . . . ."), *rev. denied*, 2005 WI 1, 277 Wis. 2d 153, 691 N.W.2d 354 (2004). Although not binding on this Court, the principles articulated in these cases are well-reasoned and support our conclusion in the case at bar.

We recognize that there may be cases involving a person's mental capacity that will necessitate expert testimony; however in light of Clara's own testimony and the significant amount of lay witness testimony regarding Clara's condition, this is not such a case. Consequently, the State was not required to use expert testimony pursuant to Rule 702 to establish the extent of Clara's mental capacity to consent to sexual acts. Accordingly, we reverse the decision of the Court of Appeals and remand this case to that court for consideration of defendant's remaining issues.

REVERSED AND REMANDED.