IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-252

Filed 15 January 2025

Gaston County, Nos. 20CRS056287–88

STATE OF NORTH CAROLINA

v.

ROBERT AHMAAD MIDDLETON, JR.

Appeal by defendant from judgments entered 28 February 2023 by Judge William R. Bell in Gaston County Superior Court. Heard in the Court of Appeals 24 September 2024.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Heidi M. Williams, for the State.*
>
> *William D. Spence for defendant-appellant.*

ZACHARY, Judge.

Defendant Robert Ahmaad Middleton, Jr., appeals from judgments entered upon a jury's verdicts finding him guilty of (1) first-degree murder of his infant son, "Dylan," and (2) intentional child abuse inflicting serious bodily injury of Dylan's twin brother, "Daniel."[1] After careful review, we conclude that Defendant received a fair

---

[1] Throughout their appellate briefs, Defendant and the State respectively identify the twins as "T1"/"Twin 1" and "T2"/"Twin 2." However, for clarity and ease of reading—as well as sensitivity to the minor victims in this case—we employ pseudonyms in this opinion. *See generally* N.C.R. App. P. 42. Hereinafter, we shall refer to "T1"/"Twin 1" as "Dylan" and "T2"/"Twin 2" as "Daniel."

trial, free from error.

## BACKGROUND

Defendant and Takaylia Young ("Ms. Young") began a relationship in the spring of 2018. Soon after the couple began living together, Ms. Young became pregnant. She terminated the pregnancy at Defendant's urging; however, she told Defendant that if she became pregnant again, she would not obtain another abortion. In October 2019, Ms. Young discovered that she was pregnant again—this time, with twins. But when she told Defendant, he "wasn't too excited about it" and hung up the phone. Defendant made it clear to Ms. Young that he wanted her to abort the twins. Ms. Young refused.

Twins Dylan and Daniel were born prematurely in May 2020, and they remained in the neonatal intensive care unit ("NICU") until early June. When they were discharged from the NICU, Ms. Young brought the twins home to the apartment she shared with Defendant. On 12 and 18 June 2020, the twins had wellness checks with their pediatrician, during which nothing unusual was noted.

On Saturday, 20 June 2020, Ms. Young and her stepfather drove to Walmart in Belmont to get groceries, diapers, and other necessities, leaving Defendant home alone with the twins for a couple of hours. Defendant was playing video games when Ms. Young and her stepfather returned from their errands. Ms. Young inquired about the twins, and Defendant "said they were fine."

However, the next day, 21 June 2020, Ms. Young began to notice concerning

changes in Dylan. She observed that Dylan "was off," in that "he was really, really tired, like, exhausted tired." The twins had an eye doctor's appointment scheduled for early Monday morning, 22 June 2020, which was only the twelfth day since their release from the NICU. But Dylan had not fed since Sunday night, after multiple attempted feedings throughout the night and into Monday morning. Before the twins' appointment, Ms. Young called their pediatrician and left a message expressing concern that Dylan was not eating.

At the eye doctor's office, Dylan failed to blink his eyes during dilation, and "he just didn't look right and [his] breathing patterns . . . [weren't] right." Meanwhile, the twins' pediatrician returned Ms. Young's phone call and instructed her to take Dylan directly to the local emergency room. Although Ms. Young heeded the pediatrician's advice, Dylan's condition worsened at the emergency room, and he was airlifted to Levine Children's Hospital ("Levine") in Charlotte. There, Dylan was diagnosed with, *inter alia*, "a fractured skull and . . . severe bleeding in the brain." Dylan was also severely dehydrated and unable to breathe on his own; he was given fluids and medication and placed on life support.

Dr. Kendra Ham ("Dr. Ham"), a child-abuse pediatrician at Levine, testified at trial that Dylan had a parietal skull fracture on the left side of his head, along with "associated scalp swelling," which "happen[ed] quickly after [an impact], . . . up to 72 hours after an injury occurred." Dr. Ham also noted the existence of a bilateral subdural hematoma—a brain injury that typically results from "extreme force" or

"rapid acceleration, deceleration"—which had occurred "within the last 72 hours." According to Dr. Ham, this injury could not have been caused by "a simple fall from an adult height," and Dylan's records showed no "pre-existing condition or injury" that would account for it.

In addition, Dylan suffered (1) bilateral subarachnoid hemorrhages; (2) an intraventricular hemorrhage, which Dr. Ham noted was not typically seen "in accidental injuries"; (3) cerebral edema, or "swelling of the brain"; and (4) a fracture to his left wrist, which Dr. Ham said was "very specific for physical abuse." Dr. Ham explained that "[d]ue to the constellation and extent of [Dylan's] injuries," her "medical assessment was consistent with abusive head trauma." According to Dr. Ham, Dylan's injuries could not have resulted from "a simple fall" or "accidentally bump[ing the] child's head into the wall or door frame"; rather, Dr. Ham explained, Dylan's injuries were consistent with those that she would expect to see from "someone shaking [the] child and throwing [him] on the floor."

On the evening of 23 June 2020, Daniel was also admitted to Levine, where doctors noticed "bruising and swelling on [his] eyes." According to Dr. Ham's report, which was admitted at trial as State's Exhibit 34, Daniel "presented [at Levine] for a medical screening exam per recommendations due to his twin brother being admitted to the [pediatric intensive care unit] with injuries concerning for abusive head trauma and physical abuse." Following a full examination, doctors determined that Daniel "had similar injuries [to Dylan]. He also had a brain fracture and several bleeds on

his brain." Dr. Ham diagnosed Daniel with (1) a left parietal skull fracture; (2) a subdural hematoma; (3) a subarachnoid hemorrhage; and (4) bruising to his upper left eyelid. Dr. Ham testified that, as with Dylan, Daniel's injuries were "consistent with inflicted trauma or abusive head trauma" but not with "a bump into the wall" or "a simple fall."

During his hospitalization, Daniel exhibited "intermittent hypothermia . . . and feeding difficulties believed to be due to his traumatic brain injury"; however, his condition eventually improved, and he was discharged from Levine on 8 July 2020. That same day, Dylan "was withdrawn from life support due to his very poor prognosis." He died that day.

Dr. Thomas Owens ("Dr. Owens"), a forensic pathologist and medical examiner, performed an autopsy on Dylan's body on 9 July 2020. Dr. Owens testified that Dylan suffered (1) a skull fracture on the left side of his head, which "require[d] an impact"; (2) a hemorrhage in the left parietal tissue; (3) bilateral subarachnoid hemorrhages caused by "violent, rapid, forceful shaking"; and (4) a fracture on the left wrist, caused by the arm "being moved back and forth in a rapid manner." Dr. Owens ultimately opined that Dylan's death was caused by "blunt force head trauma due to a nonaccidental method."

## *Investigation and Trial*

Investigators representing various law enforcement and child protective services agencies questioned Defendant and Ms. Young on multiple occasions during

the twins' stay at Levine. Defendant initially reported no knowledge of any traumatic events, although he admitted that he had once "plopped down" on the bed beside Dylan during a nighttime feeding, causing Dylan's head to rise "approximately two inches off the bed." Defendant shared this story with at least three investigators, including Detective Albert Fleming ("Detective Fleming") of the Gastonia Police Department.

On 23 June 2020, Ms. Young told a DSS caseworker that Defendant "would sometimes be fast and rough" in his interactions with the twins, leading her to ask him "to be gentler with the children." Ms. Young also reported that when she first asked Defendant about the twins' injuries, he denied any knowledge of what had occurred. However, Defendant eventually "offered one explanation." Defendant told Ms. Young that he had awoken one night because he heard one of the twins crying: "It was dark in the hall so he picked one of the boys up, . . . [they] had spit up on themselves, and they were crying so he was trying to pick the baby up and accidentally ran into the corner of the wall in the bedroom."

At Ms. Young's urging, Defendant repeated this story to DSS. Ms. Young also asked the physicians at Levine whether the events described by Defendant could have caused the twins' injuries, but "they told [her] it couldn't have."

On 20 July 2020, a grand jury returned indictments charging Defendant with murder (as to Dylan) and intentional child abuse inflicting serious bodily injury (as

to Daniel).[2]

Defendant continued to adopt different stories throughout the investigation of the case and while he awaited trial in this matter. While he was in jail, Defendant spoke to fellow inmate Brandon Woods ("Mr. Woods") about the twins and the reasons for his incarceration. Mr. Woods testified at trial that the "first story" that Defendant told him about Dylan's injuries was that an "old lady" had "bumped into him while he was carrying his baby and he dropped his baby"; however, this story "[didn't] sound right" to Mr. Woods. Defendant later told Mr. Woods a different version of the "same little story," in which "two Mexican kids . . . playing soccer . . . bumped into [Defendant]," who "dropped [the] baby, and [Defendant] just kept it moving." Mr. Woods testified that he ultimately told Defendant that he "didn't believe it . . . . [the] story kept changing and [Defendant] needed to keep it real."

According to Mr. Woods, upon this confrontation, Defendant broke down and

> said that he was playing his [video] game and the baby kept crying and [he] couldn't get the baby to stop crying and didn't know what [the baby] wanted. He said he got frustrated, and when the baby wouldn't take a bottle, then bam bam and [he] hit the baby with the bottle and the baby started crying louder. . . . He said the baby kept . . . making these little noises, and he picked [the baby] up . . . and he threw [the baby] down.

Mr. Woods, who was incarcerated on drug-related charges, shared Defendant's statements with Detective Fleming in October 2020. He testified, however, that he

---

[2] Superseding indictments were issued for both charges on 16 May 2022.

did not receive "any consideration from the State" as a result of the information that he provided to law enforcement officers in Defendant's case.[3]

On 14 February 2023, Defendant's case came on for jury trial in Gaston County Superior Court. At the close of the State's evidence, Defendant moved to dismiss both charges due to insufficient evidence, and he renewed his motion at the close of all evidence; the trial court denied Defendant's motion on both occasions.

On 28 February 2023, the jury returned verdicts finding Defendant guilty of first-degree murder and intentional child abuse inflicting serious bodily injury. The trial court entered separate judgments, sentencing Defendant to life imprisonment without parole for his conviction of first-degree murder and imposing a concurrent, active term of 180 to 228 months' imprisonment for his conviction of intentional child abuse inflicting serious bodily injury.

Defendant gave oral notice of appeal.

## DISCUSSION

On appeal, Defendant first contends that the trial court erred by denying his motion to dismiss the charges of (1) first-degree murder (as to Dylan), and (2) intentional child abuse inflicting serious bodily injury (as to Daniel), because the State's evidence was insufficient to submit either charge to the jury.

Defendant further argues "that the trial court committed plain error" by

---

[3] Mr. Woods's charges were dismissed, and he was released from jail in December 2020 after his codefendant "took responsibility for everything."

allowing the State to present the testimony of Mr. Woods, because (1) the evidence "was 'inherently incredible' pursuant to *State v. Miller*, 270 N.C. 726, 154 S.E.2d 902 (1967)"; and (2) Mr. Woods was acting "as an agent of the State" when he unlawfully "interrogated" Defendant in jail, in violation of his constitutional rights.

## A. Defendant's Motion to Dismiss

The State sought to convict Defendant of first-degree felony murder in the death of his infant son, Dylan, based on the underlying felony of intentional child abuse inflicting serious bodily injury. The State also charged Defendant with the same offense—intentional child abuse inflicting serious bodily injury, in violation of N.C. Gen. Stat. § 14-318.4(a3)—in relation to Dylan's twin brother, Daniel.

Excluding medical testimony and similar evidence regarding the twins' individual injuries (and death, in Dylan's case), much of the State's evidence at trial was, by necessity, the same for each victim. As a result, many of Defendant's appellate arguments concerning the trial court's denial of his motion to dismiss are also quite similar. Accordingly, we shall consider the sufficiency of the State's evidence of both charges contemporaneously.

### 1. Standard of Review

Whether the State presented sufficient evidence to withstand a motion to dismiss is a question of law reviewed de novo. *State v. Cox*, 367 N.C. 147, 150–51, 749 S.E.2d 271, 274–75 (2013). "Upon a defendant's motion to dismiss for insufficient evidence, the question for the Court is whether there is substantial evidence (1) of

each essential element of the offense charged and (2) of [the] defendant's being the perpetrator of such offense." *Id.* at 150, 749 S.E.2d at 274 (cleaned up).

> Substantial evidence is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion. In this determination, all evidence is considered in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence.

*State v. Hunt*, 365 N.C. 432, 436, 722 S.E.2d 484, 488 (citation omitted).

The same test applies "whether the evidence is direct, circumstantial, or both." *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984). "Thus, if there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *Hunt*, 365 N.C. at 436, 722 S.E.2d at 488 (citation omitted).

### 2. Analysis

In North Carolina, the felony-murder rule is statutory. *See* N.C. Gen. Stat. § 14-17(a) (2023). Pursuant to the felony-murder rule, a homicide "committed in the perpetration or attempted perpetration of any . . . felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree." *Id.*

When the offense underlying a felony-murder charge is felonious intentional child abuse, the State must "prove that the killing took place while the accused was perpetrating or attempting to perpetrate felonious child abuse with the use of a

deadly weapon." *State v. Pierce*, 346 N.C. 471, 493, 488 S.E.2d 576, 589 (1997); *see also* N.C. Gen. Stat. § 14-17(a).

Pursuant to N.C. Gen. Stat. § 14-318.4(a3), the felony child-abuse statute at issue here,

> [a] parent or any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious bodily injury to the child or who intentionally commits an assault upon the child which results in any serious bodily injury to the child, or which results in permanent or protracted loss or impairment of any mental or emotional function of the child, is guilty of a Class B2 felony.

N.C. Gen. Stat. § 14-318.4(a3). In this context, "serious bodily injury" means "[b]odily injury that creates a substantial risk of death or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization." *Id.* § 14-318.4(d)(1).

Certain inferences may arise from the evidence in cases of felony child abuse or felony murder based on felony child abuse. Foremost, as our Supreme Court articulated in *Pierce*, "[w]hen a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons." 346 N.C. at 493, 488 S.E.2d at 589; *see, e.g.*, *State v. Frazier*, 248 N.C. App. 252, 262, 790 S.E.2d 312, 320 (reiterating that "the offense of felonious child abuse, where [the] defendant's hands were a deadly weapon, serve[s] to elevate the killing

to first-degree murder under the felony murder rule"), *disc. review denied*, 369 N.C. 188, 794 S.E.2d 330 (2016).

Furthermore, "when an adult has exclusive custody of a child for a period of time during which the child suffers injuries that are neither self-inflicted nor accidental, there is sufficient evidence to create an inference that the adult intentionally inflicted those injuries." *State v. Liberato*, 156 N.C. App. 182, 186, 576 S.E.2d 118, 120–21 (2003). This is significant because both offenses—that is, felony child abuse and felony murder predicated on felony child abuse—are general-intent, rather than specific-intent, crimes. *See Pierce*, 346 N.C. at 494, 488 S.E.2d at 589 ("General-intent crimes are crimes which only require the doing of some act." (cleaned up)). As a result, N.C. Gen. Stat. § 14-318.4(a3) merely "requires the State to prove that the accused intentionally inflicted a serious [bodily] injury upon the child or intentionally committed an assault resulting in a serious [bodily] injury to the child." *Id.* (cleaned up). Similarly, "[f]elony murder on the basis of felonious child abuse requires the State to prove that the victim was killed during the perpetration or attempted perpetration of felonious child abuse with the use of a deadly weapon." *Id.* (citing N.C. Gen. Stat. § 14-17). Neither offense "require[s] the State to prove any specific intent on the part of the accused." *Id.*

In the present case, the State presented substantial evidence that Defendant committed intentional child abuse inflicting serious bodily injury with regard to both twins, and that Dylan died as a result. It is undisputed that Defendant fathered the

twins, and that Dylan and Daniel were infants at the time they incurred their injuries. Moreover, the overwhelming medical evidence establishes that both twins suffered multiple severe head injuries, including bilateral subdural hematomas and subarachnoid hemorrhages. It is manifest that such serious trauma to the developing heads of five-week-old infants constitutes "serious bodily injury" within the meaning of our child-abuse statutes. *See* N.C. Gen. Stat. § 14-318.4(d)(1) (defining "[s]erious bodily injury" as "[b]odily injury that creates a substantial risk of death or that causes serious permanent disfigurement, coma, a permanent or protracted condition that causes extreme pain, or permanent or protracted loss or impairment of the function of any bodily member or organ, or that results in prolonged hospitalization"). Indeed, both twins required approximately two weeks' hospitalization in Levine's pediatric intensive care unit due to their injuries. Although Daniel's condition improved and he was discharged on 8 July 2020, Dylan died that day, after he was withdrawn from life support.

Significantly, Dr. Ham noted that during their previous stay in the NICU—which preceded their admission to Levine by barely a fortnight—both twins had two normal ultrasounds of their heads; the significant trauma that was evident at Levine had not yet occurred when the twins were in the NICU.

Dylan also suffered a "corner or bucket handle fracture" of his left wrist. According to Dr. Ham, such fractures "have a high predictive value for physical abuse in infants less than one year of age" and are the most common type of fracture "found

in fatal abuse cases." This type of fracture "involves torsional and shearing strains of the bone by forcefully pulling or twisting of the extremity and can also be seen when infants are shaken, and extremities are flailing." *Cf. Pierce*, 346 N.C. at 493, 488 S.E.2d at 589 ("The evidence that [the defendant] caused a small child's death by shaking her with his hands was sufficient to permit the jury to conclude that [the] defendant committed felonious child abuse and that he used his hands as deadly weapons.").

Daniel, on the other hand, presented at Levine with bruising and swelling to the upper left eyelid "without explanation for the injury." Dr. Ham noted in her report that "[a]ny bruise in an infant under 4 months is highly concerning and suspicious for physical abuse." *See Liberato*, 156 N.C. App. at 186, 576 S.E.2d at 120–21 (explaining that "when an adult has exclusive custody of a child for a period of time during which the child suffers injuries that are neither self-inflicted nor accidental, there is sufficient evidence to create an inference that the adult intentionally inflicted those injuries").

On appeal, Defendant concedes that Dr. Ham testified that the injuries to Dylan and Daniel, "taken all together, were consistent with child abuse"; however, he contends that "Dr. Ham did not express an opinion that the injuries she found were caused by intentional child abuse, nor that [D]efendant had assaulted either child." This argument is demonstrably false. Dr. Ham testified that in her medical opinion, both twins' injuries were indicative of "nonaccidental" or "inflicted trauma"—

specifically, "abusive head trauma." And although Defendant also asserts that the State failed to present substantial "credible" evidence that his actions (or the twins' injuries) were, in fact, *intentional*, our precedent does not require the State to make such a showing. *See Pierce*, 346 N.C. at 494, 488 S.E.2d at 589.

Notwithstanding Defendant's assertions otherwise, we conclude that the State's evidence was more than sufficient to withstand Defendant's motion to dismiss the charges. In addition to the evidence discussed above, the State established that Defendant's story changed numerous times, which the jury could infer as a sign of his dishonesty, or even guilt. Mr. Woods testified that Defendant admitted to getting frustrated with one of his babies for crying; to striking one of the babies in the face with a bottle; and to picking up and throwing down one of the babies during the time that Ms. Young was out grocery shopping on 20 June 2020, within the 72-hour window of injury described by Dr. Ham. Defendant also admitted that he bumped one of the twins' heads against a wall and slapped and threw the other twin. Moreover, although he initially denied having any knowledge of the twins' injuries, Defendant eventually admitted to Detective Fleming that he was aware that his "actions . . . caused those injuries."

Viewed in the light most favorable to the State, the State's evidence was more than sufficient to allow a jury to reasonably infer that Defendant committed intentional child abuse inflicting serious bodily injury with regard to both Dylan and Daniel. The trial court therefore did not err by denying Defendant's motion to dismiss

this charge as applied to Daniel. And because the State also presented substantial evidence that Dylan's death resulted from felonious child abuse with the use of a deadly weapon (i.e., Defendant's hands), the court properly denied Defendant's motion to dismiss the charge of first-degree murder of Dylan.

Accordingly, we conclude that the State presented sufficient evidence to withstand Defendant's motion to dismiss both charges.

## B. Admission of Mr. Woods's Testimony

Defendant's final argument on appeal is that the trial court erred by allowing the State to present the testimony of Mr. Woods because (1) the evidence was "inherently incredible"; and (2) its admission violated Defendant's constitutional rights under the Fifth and Sixth Amendments.

### 1. *Plain Error*

Although Defendant acknowledges that he failed to object at trial to the testimony that he now challenges on appeal, he specifically and distinctly contends that the admission of this testimony amounted to plain error. *See* N.C.R. App. P. 10(a)(4).

To meet his burden of establishing plain error, Defendant "must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (cleaned up).

"Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings . . . ." *Id.* (cleaned up).

Here, Defendant asserts that the trial court committed plain error in admitting Mr. Woods's testimony because "it was 'inherently incredible' pursuant to *State v. Miller*, 270 N.C. 726, 154 S.E.2d 902 (1967)." The State responds that "[a]ccepting Defendant's argument would drastically expand the scope of *Miller* and would encroach upon the jury's exclusive role to determine the credibility of witnesses and to determine the truth." We agree with the State.

It is well established that "the credibility of witnesses and the proper weight to be given their testimony is to be determined by the jury," rather than the trial court. *Miller*, 270 N.C. at 730, 154 S.E.2d at 904. In *Miller*, however, our Supreme Court recognized a narrow exception to this general rule, which applies "where the only evidence identifying the defendant as the perpetrator of the offense is inherently incredible because of undisputed facts, clearly established by the State's evidence, as to the physical conditions under which the alleged observation occurred." *Id.* at 731, 154 S.E.2d at 905; *see also id.* at 732, 154 S.E.2d at 905 ("Without the testimony of [the witness], there would be a complete failure of the State's evidence to connect the defendant . . . with the offense with which he is charged.").

We agree with the State that the *Miller* rule propounded by Defendant is wholly inapplicable here. First, our Supreme Court has long since clarified that its

holding in *Miller* "was based on the general rule that *evidence which is inherently impossible or in conflict with indisputable physical facts or laws of nature* is not sufficient to take the case to the jury." *State v. Cox*, 289 N.C. 414, 422–23, 222 S.E.2d 246, 253 (1976) (emphasis added). Defendant does not—and indeed, cannot—suggest that Mr. Woods's testimony in this case conflicts with "indisputable physical facts or laws of nature"; rather, Defendant merely identifies certain discrepancies in Mr. Woods's testimony as compared to other evidence offered by the State. But whether these discrepancies evinced flaws in Mr. Woods's overall credibility as a witness, or instead with the content of his testimony—namely, Defendant's constantly changing stories regarding the twins' injuries and his knowledge thereof—was properly a matter for the jury's determination. *Cf. id.* at 423, 222 S.E.2d at 253 (reaffirming the "sound" holding in *Miller*, but noting that "it has no application where, as here, there is a reasonable possibility of observation sufficient to permit subsequent identification" because "[i]n such event, the credibility of the witness and the weight of his identification testimony is for the jury" (cleaned up)).

Moreover, contrary to Defendant's assertions, any potential questions about Mr. Woods's credibility—including, for example, the circumstances through which he became acquainted with Defendant or his decision to share information with law enforcement—are characteristic of those properly left for the jury's determination. Recognizing this, the trial court properly instructed the jurors, *inter alia*, that they "[we]re the sole judges of the believability of a witness"; that they could "believe all

or any part or none of what a witness . . . testified to from the witness stand"; and that, in deciding whether to believe a witness, they should consider such common-sense factors as "any interest, bias, or prejudice" displayed by the witness, "or whether the testimony is consistent with other believable evidence in the case."

In summary, Defendant's challenge to Mr. Woods's testimony does not concern "inherently incredible" observations but rather the type of witness-credibility determinations that jurors are called upon to make in nearly every trial. Defendant has thus failed to show that the trial court's admission of this testimony constituted error, much less plain error.

### 2. Constitutional Arguments

Defendant last argues that the trial court erred by admitting Mr. Woods's testimony because Mr. Woods was acting "as an agent of the State who interrogated [Defendant] on behalf of the State in violation of [D]efendant's rights under the Fifth and Sixth Amendments of the United States Constitution."

However, Defendant did not object to the admission of Mr. Woods's testimony—on constitutional grounds or otherwise—and therefore, he has waived appellate review of this issue. "In order to preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent." *State v. Patterson*, 249 N.C. App. 659, 664, 791 S.E.2d 517, 521 (citation

omitted), *disc. review denied*, 369 N.C. 199, 794 S.E.2d 328 (2016); *see also* N.C.R. App. P. 10(a)(1).

Moreover, although Defendant requests plain error review, "constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal, not even for plain error." *State v. Wilkins*, 287 N.C. App. 343, 349, 882 S.E.2d 454, 458 (2022) (cleaned up), *disc. review denied*, 385 N.C. 313, 890 S.E.2d 903 (2023). The argument Defendant presents on appeal "is solely a constitutional one." *Id*. Thus, it is "an issue that is fully waived if not timely asserted in the trial court." *Id*. Accordingly, this argument is waived.

## **CONCLUSION**

For the reasons stated herein, the trial court did not err by denying Defendant's motion to dismiss the charges of first-degree murder and intentional child abuse inflicting serious bodily injury, nor did the trial court commit plain error by allowing the State to present the testimony of Mr. Woods. Accordingly, we conclude that Defendant received a fair trial, free from error.

NO ERROR.

Judges STROUD and HAMPSON concur.